**STATES STEAMSHIP COMPANY**

v.

**The UNITED STATES.**

No. 109–69.

United States Court of Claims.

July 15, 1970.

Mark P. Schlefer, Washington, D. C., attorney of record, for plaintiff. Stuart C. Law, John Cunningham, Kominers, Fort, Schlefer, Farmer & Boyer, Washington, D. C., of counsel.

Edward J. Friedlander, Washington, D. C., with whom was Asst. Atty. Gen. William D. Ruckelshaus, for defendant.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON and NICHOLS, JUDGES.

## ON PLAINTIFF'S MOTION AND DEFENDANT'S CROSS–MOTION FOR SUMMARY JUDGMENT

DURFEE, Judge.

This is a case in which plaintiff is seeking to secure for itself the benefits of the 7 percent investment tax credit by alleging that defendant has violated § 203(e) of the Revenue Act of 1964. P. L. 88–272, § 203(e), 78 Stat. 35.

States Steamship Company ("States") entered into an operating-differential subsidy (ODS) agreement and addenda thereto ("the contract") with the Federal Maritime Board, pursuant to the Merchant Marine Act of 1936, 46 U.S.C. § 1101 et seq. (1964). Since the signing of the contract, the Maritime Administration and the Maritime Subsidy Board (hereinafter collectively called "Maritime") have succeeded to the functions of the Federal Maritime Board.

The operating-differential subsidy contract requires States to operate U.S.-flag vessels on routes designated therein, determined by Maritime to be essential to the foreign commerce of the United States. The contract also prescribes how the vessels shall be operated. In return, the contract provides for payment to States of operating-differential subsidy, which is designed to equalize, in part at least, States' costs of operation with those of its foreign-flag competitors.

The subsidy payments due under the contract are subject to being reduced by "recapture." This means that only one-half of States' profits in excess of ten percent of the "capital necessarily employed" in operating its subsidized vessels, averaged cumulatively over a ten-year "recapture period," are repaid to the United States. Maritime withholds from plaintiff its subsidy payments for the amount of estimated recapture which has accumulated since the beginning of the recapture period. The remainder of net profits in excess of ten percent of "capital necessarily employed" when paid to plaintiff, must be deposited by it in a special reserve fund.

"Net profits" has been defined by Maritime, for purposes of computing recapture and deposits in the special reserve fund, in General Order 31, 2d Revision, 46 C.F.R. 286.4(a) (January 1, 1968 rev.), 25 F.R. 3714 (April 28,

1960),[1] as gross revenue from subsidized operations less certain enumerated operating costs, including Federal income taxes. This means that if operating costs are decreased, net profits are increased. This, in turn, means that net profits subject to recapture are increased, and States' subsidy under the contract is correspondingly reduced.

The controversy between the parties centers around the 7 percent investment tax credit. The Internal Revenue Code of 1954, § 38, allows a credit against income tax when investment is made in certain depreciable property. The amount of the credit is 7 percent, as set forth in § 46 of the Code. Following the passage of the investment tax credit in 1962, States included the full amount of its Federal income taxes in its costs of operation, and did not reduce this by the amount of its investment tax credit.

In 1964, § 203 of the Revenue Act of 1964, was passed. Section 203(e) reads as follows:

*TREATMENT OF INVESTMENT CREDIT BY FEDERAL REGULATORY AGENCIES.*—It was the intent of the Congress in providing an investment credit under section 38 of the Internal Revenue Code of 1954, and it is the intent of the Congress in repealing the reduction in basis required by section 48(g) of such Code, to provide an incentive for modernization and growth of private industry (including that portion thereof which is regulated). Accordingly, Congress does not intend that any agency or instrumentality of the United States having jurisdiction with respect to a taxpayer shall, without the consent of the taxpayer, use—

(1) in the case of public utility property (as defined in section 46(c) (3) (B) of the Internal Revenue Code in 1954), more than a proportionate part (determined with reference to the average useful life of the property with respect to which the credit was allowed) of

the credit against tax allowed for any taxable year by section 38 of such Code, or

(2) in the case of any other property, any credit against tax allowed by section 38 of such Code,

to reduce such taxpayer's Federal income taxes for the purpose of establishing the cost of service of the taxpayer or to accomplish a similar result by any other method.

There followed, on April 27, 1965, the issuance of Accounting Instruction No. 37 by the Comptroller of the Maritime Administration, the last paragraph of which reads:

The provision for Federal income tax deducted in the determination of net earnings from subsidized operations will continue to be computed as prescribed in General Order 31, 2d Revision, *i. e.,* the tax provision shall not exceed the amount paid or payable for the year or other accounting period involved.

Maritime, in 1967, instructed States that the instruction required the reduction of Federal income tax by the amount of the credit before including them in operating costs.

States, along with other steamship lines, petitioned Maritime for an order declaring the final paragraph of Accounting Instruction No. 37 invalid, or alternatively, for an order interpreting the instruction so as to permit the lines to follow § 203(e) in determining its costs. On September 29, 1967, the Acting Maritime Administrator and the Maritime Subsidy Board upheld Accounting Instruction No. 37 as originally interpreted by Maritime. The Secretary of Commerce was then petitioned to review the decision of September 29, and on November 12, 1968, the Secretary denied the petition for review.

■ The threshold question facing the court is whether § 203(e) applies to the present situation. Defendant argues that § 203(e) forbids an agency or in-

---

I. 46 C.F.R. § 286.4 is entitled "Net earnings," but it refers specifically to "net profit."

strumentality having "jurisdiction" with respect to a taxpayer from using the credit to reduce that taxpayer's Federal income taxes, and that "jurisdiction" refers only to "statutory jurisdiction," whereas Maritime's relationship with States is purely "contractual." For a number of reasons, we reject this argument.

In the first place, the legislative history supports our conclusion that § 203(e) applies to plaintiff. Although the title of § 203 reads "Treatment of Investment Credit by Federal *Regulatory* Agencies" [Emphasis supplied], the Senate Report on the bill quoted the managers of the bill as follows:

> It is the understanding of the conferees on the part of both the House and Senate that the purpose of the credit for investment in certain depreciable property, *in the case of both regulated and nonregulated industries,* is to encourage modernization and expansion of the Nation's productive facilities and to improve its economic potential by reducing the net cost of acquiring new equipment, thereby increasing the earnings of new facilities over their productive lines. [Emphasis supplied]. Senate Report No. 830, 88th Cong., 2d Sess., pp. 42–3 (1964), U.S.Code Cong. & Admin. News 1964, pp. 1714.[2]

The Senate Report then goes on to describe how, contrary to this Congressional intent, some agencies have required the benefits of the tax credit to "flow through" to the customers. The Report then went on to say:

> As a result, the bill specifies in two paragraphs the intent of Congress as to the treatment of the investment credit by Federal regulatory agencies. It states in the case of public utility property that these regulatory agencies are not, without the taxpayer's consent, for the purpose of establishing the cost of service of the taxpayer, to treat more than a proportionate

part of an investment credit (determined with reference to the useful life of the property) as reducing the taxpayer's Federal income tax liabilities. Nor are they to accomplish a similar result by any other method. Public utility property for this purpose includes property of electric, gas, water, telephone, and telegraph public utilities which under present law is eligible for what in effect amounts to a credit of 3 percent.

> The bill also provides restrictions for Federal regulatory agencies, in the case of other regulated companies—such as natural gas pipelines, railroads, airlines, truck and bus operators, and other types of public carriers—which receive an investment credit of 7 percent of the investment in qualified property. It provides that Federal regulatory agencies are not, without the taxpayer's consent, for purpose of establishing the cost of service of the taxpayer, to treat any investment credit allowed him as reducing his Federal income taxes. Nor are the agencies to accomplish a similar result by any other method. *Id.* at 44–5, U.S.Code Cong. & Admin.News 1964, p. 1716.[3]

It is clear from a reading of the Report that Congress was concerned that *all* industries should receive the benefit of the tax credit. We note that the legislative history explicitly mentions both regulated and nonregulated industries.

Nevertheless, defendant contends that the phrase "establishing the cost of service" in § 203(e) refers only to an agency directive affecting the taxpayer's actual handling of the investment credit emanating from a legislative or executive grant, since the word "jurisdiction" is used, and not "consent." However, "cost of service" is merely a term of art which is used as a basis for determining what a company's rates or subsidy should be. The use of Federal income taxes by a company which defendant

---

**2.** See also, H.Rep.No.749, 88th Cong., 1st Sess., p. 36 (1963).

**3.** *Supra,* footnote 1 at pp. 38–39.

would consider to be "regulated" is a "cost of service"; such use is no different, however, from the way in which plaintiff employs its taxes as part of its "capital necessarily employed" in determining what its subsidy should be. Moreover, Maritime did have "jurisdiction" here. Section 606(5) of the Merchant Marine Act of 1936, 46 U.S.C. § 1176(5) (1964), is the statutory provision which requires "recapture" above 10 percent of "capital necessarily employed." Thus, in effect, a carrier's return on investment is regulated as much as the so-called "regulated" industries' rates of return.

To say that the relationship between States (and other steamship lines similarly situated) is "contractual" and not "jurisdictional" flies in the face of reality. The whole ODS system was devised because U.S.-flag carriers are more expensive to operate than foreign-flag carriers. Thus, any U.S.-flag carrier, to operate in berth line service, must enter into an ODS contract. Once this contract is entered into, then § 606(5) of the Merchant Marine Act of 1936, *supra*, prescribes how much of a subsidy the carrier must pay back to Maritime. And, as we have pointed out, the amount that may have to be paid back will be determined, in part, by the way in which the carrier is required to treat the investment tax credit.

Support for our position is found in the case of North Central Airlines, Inc. v. Civil Aeronautics Board, 124 U.S. App.D.C. 251, 363 F.2d 983 (1966). It involved an air carrier which received a subsidy (1) for carriage of mail, and (2) for additional payment "to enable it to continue the development of air transportation * * *." The subsidy was established according to a certain rate; to ensure that the rate would fall evenly on all airlines within a specific group, a profit-sharing plan was devised, and part of the subsidy was returned to the Government. The Civil Aeronautics Board wanted to use the tax credit to reduce taxes in the computation of the subsidy. The court held this to be erroneous, and its explanation for so doing applies with equal force to our case:

\* \* \* The provision in the 1964 Act was that the regulatory agencies should not reduce a taxpayer's taxes for the purpose of establishing "a similar result by any other method." This last clause seems to us to cover the problem before us. In the case of a regulated utility, if the regulating agency used the tax credit to reduce taxes in the computation of cost of service, so that cost of service declined, the allowable rate would decline and the utility would receive no benefit from the credit. In the case of a subsidized utility, the use of the credit to reduce taxes in the computation of the subsidy would reduce the subsidy. This would be a "similar result" to the one prohibited in the case of a regulated rate computation, and accomplished by another method. The use of the credit in this fashion to reduce taxes in the case of a mail subsidy being computed on a need basis, does not serve to establish the cost of service. But it accomplishes a similar result by this other method. It deprives the subsidized carrier of participation in the decreed largesse. It seems to us that the language covers the point. *Id.* at 984–985 of 363 F.2d.

It is clear from the aforementioned portion of the *North Central* opinion, *supra*, that "jurisdiction" does not hinge on an agency's power to establish cost of service; thus, if a "similar result" were accomplished nonetheless, § 203(e) would be violated. Therefore, even if the whole ODS system does not involve cost of service, a "similar result" would be accomplished here by allowing Maritime to decrease taxes by the amount of the investment credit. And this result would be accomplished by Maritime, "an agency or instrumentality of the United States."

Allowing Maritime to reduce taxes by the amount of the credit would be frustrating Congressional intent. As we

have already mentioned, it was the understanding of the conferees on the part of both the House and the Senate that the purpose of the credit was to encourage modernization and expansion of productive facilities in "both regulated and nonregulated industries." Moreover, it would be anomalous indeed to deprive a *subsidized* industry of the benefit of the credit, since that would work at cross-purposes to the subsidy, which is provided to allow the carrier to compete economically.

■ The subsidy agreement was entered into on August 23, 1957, and contained Article II–29, reflecting § 606(5) of the Merchant Marine Act of 1936 providing for "recapture." The rules and regulations of Maritime governing the application of the reserve and recapture provisions of the ODS agreements are set forth in General Order 31, 2d Revision, *supra.* Since the passage of the Act in 1936, the deduction for Federal income tax in determining net earnings has been limited to " * * * the total of such tax reported in the income tax return or assessed upon the total taxable income of the operator for the year or other accounting period involved * * *." General Order 31, 46 C.F.R. § 286.5(b) (January 1968 rev.)

Defendant argues that States has consented to Accounting Instruction No. 37, as interpreted by the Government, by virtue of having agreed to Article II–29 of the contract, which reads:

For the purposes of this agreement:

"Net earnings" or "net profit" and "capital necessarily employed in the business" or "capital investment necessarily employed in the operation of the subsidized vessel(s), service(s), route(s), and line(s)" shall be determined as provided in the applicable rules and regulations adopted and prescribed by the United States, as amended from time to time.

Thus, defendant contends, there was acceptance of Maritime's future rules and regulations.

While Article II–29 does commit plaintiff to make its computations as prescribed by the applicable rules and regulations, as amended, this contemplated that there were to be rules and regulations based on the law as it then stood. It could not have been within the contemplation of either of the parties to bind themselves to any *future* changes in the tax laws, no matter how far-reaching or important. This is especially true where a whole new provision was inserted into the tax law in 1962, and it was not until 1967 that Maritime announced that Accounting Instruction No. 37 required that Federal taxes be reduced by the amount of the credit. Moreover, the interpretation of the Instruction by Maritime is in conflict with the intent of § 203(e).

For the foregoing reasons, we conclude that plaintiff has not "consented" to Accounting Instruction No. 37, that plaintiff is entitled to the benefits of the investment tax credit by virtue of § 203(e), and that therefore, plaintiff is entitled to recover the difference between the subsidy payments made under the contract and the payments which would have been made for the period 1963–1967 had Maritime not reduced plaintiff's taxes in violation of § 203(e) by the amount of its investment tax credit, and judgment is entered accordingly, with the amount to be determined pursuant to Rule 131(c). Plaintiff's motion for summary judgment is granted, and defendant's cross-motion for summary judgment is denied.