**PACIFIC FAR EAST LINE, INC.**

v.

**The UNITED STATES.**

**No. 214–70.**

United States Court of Claims.

Oct. 20, 1976.

---

Mark P. Schlefer, Washington, D.C., attorney of record, for plaintiff. T.S.L. Perlman, Leonard Egan, Stephen T. Owen, Kominers, Fort, Schlefer & Boyer, Washington, D.C., of counsel.

Fenton P. Wilkinson, Washington, D.C., with whom was Asst. Atty. Gen. Scott P. Crampton, Washington, D.C., for defendant. Theodore D. Peyser and Robert S. Watkins, Washington, D.C., of counsel.

Before COWEN, Chief Judge, and DAVIS, SKELTON, NICHOLS, KASHIWA, KUNZIG and BENNETT, Judges, en banc.

## ON PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DEFENDANT'S CROSS MOTION FOR SUMMARY JUDGMENT

KASHIWA, Judge:

This tax refund action concerning the investment tax credit provisions of the Internal Revenue Code of 1954, §§ 38, 46–48,[1] has previously been before this court. On March 19, 1975, this court granted plaintiff's motion for partial summary judg-

---

1. All section references are to the Internal Revenue Code of 1954 unless otherwise noted. All statutory references in this opinion regarding the Internal Revenue Code refer to applicable provisions in force for the years in question, 1962, 1963, and 1964.

ment, holding that plaintiff's credit should have been computed upon its entire bases in the ships, rather than upon only a ratable portion attributable to construction work done in 1962 as defendant contended. *Pacific Far East Line, Inc. v. United States,* 513 F.2d 1355, 206 Ct.Cl. 378 (1975).[2] We shall hereinafter refer to said March 19, 1975, opinion as the first opinion.

The case is again on cross motions for summary judgment and raises the following two questions reserved by the first opinion:

1. Whether from plaintiff's cost of the ships should be deducted that portion derived from tax deferred earnings deposited in plaintiff's reserve funds to arrive at plaintiff's qualified investment for the investment credit?

2. Whether from plaintiff's qualified investment should be deducted the amount of subsequent mortgage payments made by plaintiff from tax deferred earnings?

Affidavits have been filed by plaintiff in support of its motion for summary judgment. The pleadings and the affidavits filed show that there is no genuine issue of material fact. For the reasons stated below, we grant plaintiff's motion for summary judgment and deny defendant's cross motion.

Plaintiff has been, continuously since 1953, a contractor under operating-differential subsidy agreements with the federal Maritime Board and the Maritime Administration (hereinafter either will be referred to as Maritime).[3] "To insure * * * the replacement of the contractor's subsidized vessels as may be required," § 607 of the Merchant Marine Act of 1936 (MMA) required contractors, including plaintiff, to create and maintain a "capital reserve

fund." 46 U.S.C. § 1177 (1964). In this fund plaintiff was required to deposit amounts equal to (1) the annual depreciation charges on its subsidized ships, (2) insurance proceeds from losses of subsidized ships, (3) the proceeds of sales of such ships, and (4) certain portions of its net profits, *viz.* (a) half of all profits in excess of 10 per cent per annum, (b) such further portion as Maritime might deem necessary to build up a vessel replacement fund and (c) such further portion as the contractor might elect with Maritime's approval. From the "capital reserve fund" the statute permitted the contractor to "make disbursements for the purchase of replacement vessels" and to "pay the principal, when due, on all notes secured by mortgage on the subsidized vessels." 46 U.S.C. § 1177(b) (1964).

Also, "to insure the continued maintenance and successful operation of the subsidized vessels" the contractor must create a "special reserve fund" into which he shall deposit certain excess profits. 46 U.S.C. § 1177(c)(1964). The statute went on to provide (46 U.S.C. §§ 1177(f), (h) (1964)) that upon the termination of the subsidy contract "the reserve funds * * * shall be the property of the contractor * * *." and that "[t]he earnings * * * deposited in the contractor's reserve funds as provided in this section * * * shall be exempt from all Federal taxes." (Hereinafter, capital reserve fund and special reserve fund will be referred to collectively as reserve funds.)

In 1947, several years before plaintiff became subsidized, shipowners then subsidized entered into tax closing agreements with the Commissioner of Internal Revenue (Commissioner). Those closing agreements provided that all earnings after 1946 deposited in the lines' reserve funds should be

---

**2.** In its companion case, *Lykes Bros. S. S. Co. v. United States,* 206 Ct.Cl. 354, 513 F.2d 1342 (1975), judgment was also entered in favor of the plaintiff taxpayer.

**3.** For a description and the purpose of the operating-differential subsidy program, see, e.g., *Moore-McCormack Lines, Inc. v. United States,* 413 F.2d 568, 188 Ct.Cl. 644 (1969); *American*

*Export Isbrandtsen Lines, Inc. v. United States,* 499 F.2d 552, 204 Ct.Cl. 424 (1974); *Farrell Lines Inc. v. United States,* 499 F.2d 587, 204 Ct.Cl. 482 (1974); Pacific Far East Line, Inc. v. United States, *394 F.2d 990, 184 Ct.Cl. 169 (1968). As the program relates to the investment credit, see* States S. S. Co. v. United States, *428 F.2d 832, 192 Ct.Cl. 795 (1970).*

"tax-deferred income." [4] The closing agreements defined tax deferred as meaning the income is not taxed but is not recognized in "cost basis" or "invested capital." This provision contained the following proviso: "provided, however, that the taxpayer shall not be bound by this commitment beginning with the calendar year in which a decision of any court, sustaining the contention that Section 607(h) of the Act [MMA] gives a tax exemption, instead of a Tax-deferment as herein provided, shall become final." The closing agreements contained other provisions concerning the time of accrual of deposits, investment income of the reserve funds, the useful life of vessels for depreciation, and the allocation of funds between income and capital items.

In 1952, after plaintiff had applied for a subsidy, Maritime offered it a subsidy contract providing in part that "No subsidy accrued hereunder shall be paid * * * unless the Operator is * * * a party to * * * a Closing Agreement similar in scope and effect, so far as applicable, to the Closing Agreements with the then subsidized Operators approved July 21, 1947 * * *." Although it had no dispute with the Internal Revenue Service (IRS), plaintiff had no choice but to apply for and execute a closing agreement, in order to obtain the subsidy accruing to it. The Commissioner approved the agreement on April 13, 1954.

Like its predecessors, plaintiff's closing agreement provided that all earnings deposited in the reserve funds would be "tax-deferred income" but that plaintiff would be relieved of the commitment when a court decided that § 607(h) of the MMA exempted the income from taxes. Pertinent provisions of plaintiff's closing agreement read as follows:

"Tax-deferred" or "Tax-deferment" referring to ordinary income and capital gains deposited in Reserve Funds means that such items are not to be recognized as taxable income, except as provided in paragraph VI(c) hereof, and likewise are not to be recognized in the determination of cost basis or invested capital.

\* \* \* \* \* \*

All earnings including capital gains, (not tax exempt under the Internal Revenue Code), which are deposited in the taxpayer's Reserve Funds, shall be tax-deferred income; provided, however, that the taxpayer shall not be bound by this commitment beginning with the calendar year in which a decision of any court, sustaining the contention that Section 607(h) of the Act [MMA] gives a tax exemption, instead of a Tax-deferment as herein provided, shall become final.

Plaintiff's agreement also tracked the 1947 agreements in its provisions for useful life, accrual of deposits, investment income, and allocation of the reserves. In 1964 plaintiff entered into a new closing agreement merely changing the useful life of ships from 20 years to 25 years. We shall hereafter refer to plaintiff's closing agreements as the 1947 agreement because in substance they are the identical agreements that the other shipowners entered into in 1947.

From the beginning of its subsidized operations, in accordance with § 607 of the MMA, plaintiff made periodic deposits in its reserve funds. These included amounts equal to its depreciation expense on the subsidized ships and portions of its earnings.

In 1959, pursuant to the replacement provisions of its subsidy contract, plaintiff and Maritime contracted with Bethlehem Steel Company for the construction of the ships *Philippine Bear* and *China Bear*. While they were under construction the Revenue Act of 1962 providing for the investment credit was enacted. Bethlehem delivered the ships in 1962 and they then entered the plaintiff's subsidized service. Plaintiff used

---

4. Deposits of pre-1943 income and capital gains were agreed to be exempt; deposits of 1943–1945 ordinary income were agreed to be taxable but the lines were given an election not to be taxed on deposited capital gains of those years, in which event the gains were to be included in cost basis but not in invested capital.

them in its business of carrying cargo for hire between United States ports on the West Coast and the Far East.

Plaintiff paid $14,558,925 for the ships.[5] It financed these payments with $10,274,557 borrowed on the security of mortgages on the ships and $4,284,368 cash down payment from its own funds. The down payment included $1,406,416 of reserve funds moneys attributed to plaintiff's deposits of earnings treated as "tax-deferred" and $2,877,952 of plaintiff's general moneys and reserve funds moneys attributed to deposits of funded depreciation or other forms of capital.

Since delivery of the ships plaintiff has made periodic payments of principal and interest on the mortgages. These payments were in part drawn from the reserve funds. The source of the reserve funds moneys included $1,912,332 allocated to plaintiff's earlier deposits of tax deferred earnings.

In filing its federal income tax returns for 1962, 1963, and 1964,[6] plaintiff claimed an investment credit of $999,479, seven per cent of $14,278,270, which it then computed as its qualified investment eligible for the investment tax credit.[7] On audit the IRS reduced the credit to $146,410, then "recaptured" $20,795 of that sum. The reduction reflected (i) the elimination of the portion (84.7 per cent) of plaintiff's cost that the IRS attributed to construction work before January 1, 1962, and (ii) the elimination of a further part of the cost on account of the $1,406,416 that had been part of plaintiff's down payment for the ships, that was drawn from the reserve funds, and that in accounting for those funds was allocated to tax deferred earnings. The "recapture" reflected (iii) the elimination of a still further part of the cost on account of $1,912,332 of plaintiff's mortgage payments in 1962, 1963, and 1964 that had been drawn from its reserve funds and had been allocated to tax deferred earnings. The IRS issued a deficiency notice accordingly. Having paid the deficiency and having filed a claim for refund in the amount of $791,927.60, which was denied, plaintiff brought this action.[8] This court in its first opinion held that plaintiff's cost attributable to pre-1962 construction could properly be considered for the investment credit computation. The amounts which are presently at issue are payments by the plaintiff of tax deferred income from its reserve funds for the two ships it placed in service in 1962.

The issues are:

1. Whether the basis for the investment credit is plaintiff's cost or whether from that cost must be deducted $1,406,-416 representing down payments drawn from the reserve funds and allocated to tax deferred earnings, and

2. Whether from the cost should be further deducted $1,912,332 representing subsequent mortgage payments drawn from the reserve funds and allocated to tax deferred earnings.

In order to answer these questions we must first examine the relevant investment

---

5. The total cost of the two vessels was $27,-931,945, of which $13,373,020 was paid to Bethlehem by Maritime as construction-differential subsidy and as payment for national defense features built into the vessels at the instance of the Navy.

6. The credit was spread over three years by operation of carry-forward provisions of the Code.

7. This sum included $3,564 investment in property not in issue here, leaving $14,274,706 as its investment in the ships. Later outlays brought the final cost to $14,558,925. Plaintiff's refund claim is predicated on 7 percent of $14,278,270. (Rounded numbers are used in the paragraph in the text and in this footnote.)

8. A balance of $81,937 unused credit was carried forward by plaintiff to 1965. The total of the $125,614 (The $1 difference is due to rounding.) ($146,410 less $20,795) allowed by the IRS, the refund claim of $791,928, and the carry forward of $81,937 is $999,479, seven percent of the plaintiff's investment. Before the IRS issued the deficiency notice the parties settled by agreement a number of issues affecting plaintiff's taxes for the years in question. The deficiency notice reflected the investment tax credit issues involved here and certain other issues. Plaintiff's refund claim was confined to the investment credit issues and the sums affected by it. (Rounded numbers are used.)

tax credit provisions. The investment tax credit sections of the Internal Revenue Code of 1954 are § 38 and §§ 46–48. Section 38 authorizes the allowance of a tax credit in an amount determined under §§ 46–48. Section 46(a)(1) provides:

> The amount of the credit * * * shall be equal to 7 percent of the qualified investment (as defined in subsection (c)).

Subsection (c) (§ 46(c)(1)) provides:

> * * * the term "qualified investment" means * * *
>
> (A) the applicable percentage of the basis of each new section 38 property (as defined in section 48(b)) placed in service by the taxpayer during such taxable year * * *[9]

Section 48(a)(1) defines "section 38 property" as follows:

> * * * the term "section 38 property" means—
>
> (A) tangible personal property * * *
>
> \* \* \* \* \* \*
>
> Such term includes only property with respect to which depreciation * * * is allowable and having a useful life (determined as of the time such property is placed in service) of 4 years or more.
>
> (2) *Property used outside the United States.—*
>
> (A) *In general.*—Except as provided in subparagraph (B), the term "section 38 property" does not include property which is used predominantly outside the United States.
>
> (B) *Exceptions.*—Subparagraph (A) shall not apply to—
>
> \* \* \* \* \* \*
>
> (iii) any vessel documented under the laws of the United States which is operated in the foreign or domestic commerce of the United States;
>
> \* \* \* \* \* \*

The investment tax credit reflects the legislature's decision to use the taxing system for economic ends. The credit was proposed by President Kennedy's tax message of 1961 to Congress, suggesting amendments to the tax laws to "increase the modernization, productivity, and competitive status of American industry—to stimulate the expansion and growth of our economy" (H.R.Doc.No.140, 87th Cong., 1st Sess. 1 (1961)). In his economic report of 1962 the President said (as quoted at H.R. Rep.No.1447, 87th Cong., 2d Sess. 7 (1962)):

> The centerpiece of these proposals is the * * * credit against tax for gross investment in depreciable machinery and equipment. * * * The tax credit increases the profitably of productive investment by reducing the net cost of acquiring new equipment. It will stimulate investment in capacity expansion and modernization, contribute to growth of our productivity, and output, and increase the competitiveness of American exports in world markets.

See, also, H.R.Rep.No.1447, *supra* at 8; S.Rep.No.1881, 87th Cong., 2d Sess. 11 (1962).

■ The conferees who reconciled the Senate and House reports adopted the following statement (H.R.Rep.No.2508, 87th Cong., 2d Sess. 14 (1962)):

> It is the understanding of the conferees on the part of both the House and the Senate that the purpose of the credit for investment in certain depreciable property, in the case of both regulated and non-regulated industries, is to encourage modernization and expansion of the Nation's productive facilities and to improve its economic potential by reducing the net cost of acquiring new equipment, thereby increasing the earnings of the new facilities over their productive lives.

It is significant that both the House and the Senate in the above statement made special

---

**9.** The "applicable percentage" depends merely upon the useful life; in case of a useful life of 8 years or more, the applicable percentage is 100 (§ 46(c)(2)). Section 48(b) defines "new section 38 property" as property built or acquired

after 1961 and was construed by this court in its first opinion and in a companion case. *Lykes Bros. S. S. Co. v. United States,* 513 F.2d 1342, 206 Ct.Cl. 354 (1975).

reference to regulated industries and that the major purpose was to reduce the cost of acquiring new equipment. It is common knowledge that regulated industries require expensive equipment costing millions of dollars. Special reference to regulated industries, therefore, should not be considered lightly. Since the conferees on the part of both the Senate and the House held the same view, we deem the special reference very material in the discussion to follow. Where the purpose of an act is specially treated, departure from the purpose defeats the legislative intent. In *Helvering v. Stockholms Enskilda Bank*, 293 U.S. 84, 55 S.Ct. 50, 79 L.Ed. 211 (1934), the Court stated at 93–94, 55 S.Ct. at 54:

> * * * The intention of the lawmaker controls in the construction of taxing acts as it does in the construction of other statutes, and that intention is to be ascertained, not by taking the word or clause in question from its setting and viewing it apart, but by considering it in connection with the context, the general purposes of the statute in which it is found, the occasion and circumstances of its use, and other appropriate tests for the ascertainment of the legislative will. Compare *Rein v. Lane*, L.R. 2 Q.B. Cases 144, 151. The intention being thus disclosed, it is enough that the word or clause is reasonably susceptible of a meaning consonant therewith, whatever might be its meaning in another and different connection. * * *

■ Before we enter into a discussion of issues, we note that this court has held that § 38 and §§ 46–48 should be *liberally* construed and, furthermore, that the purpose of the Revenue Act must be considered in construing these sections.

> * * * In applying various sections of the investment credit statute, this court and other courts have noted that the [Revenue] Act should be interpreted liberally in keeping with its purposes, * * * and this case is no exception. [*Lykes Bros. Steamship Co. v. United States,* 513 F.2d 1342, 1353, 206 Ct.Cl. 354, 375 (1975).]

*Alabama Displays, Inc. v. United States,* 507 F.2d 844, 848, 205 Ct.Cl. 716, 724 (1974); *Weirick v. Commissioner,* 62 T.C. 446, 453 (1974); *Minot Federal Savings & Loan Ass'n v. United States,* 435 F.2d 1368, 1372 (8th Cir. 1970). We shall again follow the rule of liberal construction in the discussion to follow, keeping in mind the purposes of the investment tax credit as above described. In this court's first opinion it incorporated the reasoning in *Lykes Bros.* and this court's opinions in both cases were unanimous. We should not discard the rule of liberal construction midstream. The same statutes and facts are involved herein as in the first opinion.

Plaintiff first argues that plaintiff's investment in its ships qualifies for the investment tax credit irrespective of the source of the funds invested. Defendant responsively contends that only so much of the investment is qualified investment for the investment tax credit as did not have its source in tax deferred income on deposit in the reserve funds. We have weighed the arguments made by both parties. We find plaintiff's arguments more convincing.

We observed that § 46(c)(1), quoted above, defines qualified investment as "the applicable percentage of the basis of each new section 38 property * * *." Both the House Ways and Means Committee and the Senate Finance Committee reported, "The basis of 'new section 38 property' is to be determined under the general rules for determining the basis of property. Thus, the basis of property purchased or constructed would generally be its cost." S.Rep.No.1881, *supra,* at 143; H.R.Rep.No. 1447, *supra,* at A7.

The Treasury's regulations implementing the investment credit provide (Treas.Reg. § 1.46–3(c) (1964)):

> (c) *Basis or cost.* (1) The basis of any new section 38 property shall be determined in accordance with the general rules for determining the basis of property. Thus, the basis of property would generally be its cost (see section 1012), unreduced by the adjustment to basis provided by section 48(g)(1) * * *

and any other adjustment to basis, such as that for depreciation, and would include all items properly included by the taxpayer in the depreciable basis of the property, such as installation and freight costs. * * * [10]

Section 1012, cited by the regulation, provides, "The basis of property shall be the cost of such property, except as otherwise provided in this subchapter * * *." and the Treasury's regulation interpreting § 1012 states, "The cost is the amount paid for such property in cash or other property." Treas.Reg. § 1.1012–1 (1957). None of this contains the slightest indication that "qualified investment" should exclude investment funds derived from untaxed, tax-exempt, or tax deferred income. It states that the qualified investment in a "section 38 property" is the basis of that property, that the basis is its cost, and, except for instances not here applicable, that "adjustments" to basis are to be disregarded. We believe that it is fair to say that the "general rules for determining the basis of property," referred to by the House and Senate Committees and the Treasury's regulation, have no reference to whether the funds spent as part of the "cost" of the property had their source in untaxed income. The cost of property to the taxpayer is the amount of money that he paid to acquire the property, whatever the source of the money.

As is true in this case, property is often acquired in whole or part with borrowed money; it is elementary that borrowed money is not taxed when received by the taxpayer from the lender, yet the Government could not—and does not here—contend that the taxpayer's qualified investment in the property is reduced by the amount of borrowed funds invested. The same would be true of an investment consisting in whole or in part of money received as a gift exempt from tax (§ 102), of

interest earned by the taxpayer on tax-exempt municipal bonds (§ 103), of income earned abroad on which plaintiff pays no federal income tax because of the "foreign tax credit". (§ 33), or of retirement income subject to a "retirement income credit" (§ 37). Indeed, where the invested funds are derived from income on which the taxpayer's taxes have been reduced by an investment credit on other property, Congress explicitly contemplated that a further credit should be allowed on the reinvestment, for the legislative committees stated, "It is your committee's intent that the financial assistance represented by the credit should itself be used for new investment, thereby further advancing the economy." (S.Rep. No.1881, *supra,* at 11–12; cf. H.R.Rep.No. 1447, *supra,* at 8.)

■ In view of the vast array of credits, exemptions, deferrals, deductions, and different rates of tax on income laid down by Congress in intricate detail in the Internal Revenue Code it is unthinkable that the amount of the conceptually simple investment credit was intended—without a word of textual support—to be affected by the extent of taxation or the deferral of taxation on income that had produced funds used to make the investment that creates the credit. Such a result would cause the credit to vary in an unpredictable and arbitrary amount depending on all the countless array of prior events that affected taxpayers' effective rates of taxation on income earned years before. The operation of the credit would be infinitely capricious, and the accounting difficulties in tracing funds to their source and ascertaining the extent to which they had been taxed would be staggering. As the Fifth Circuit has said, "We think that the tax statutes and regulations must be applied as written and without any equitable consideration of the desirability of offsetting prior tax benefits."

**10.** The "adjustment to basis provided by section 48(g)(1)," mentioned in the regulation, was a provision that the amount of the credit was to be deducted from the basis of the property in respect of which the credit was allowed, so that a $100 property on which a $7 credit was allowed would receive a basis of $93 for depreciation, gain, and loss. This reduction was repealed in 1964, and the repeal was given a substantially retroactive effect. Act of Feb. 26, 1964, Pub.L.No. 88–272, § 203, 78 Stat. 33.

[Footnote omitted.] *Greer v. Commissioner,* 230 F.2d 490, 493–94 (5th Cir. 1956).

Such a method, as defendant propounds, of computing the credit would be inconsistent with the reiterated purpose of its sponsors, to increase the profitability of investment. Any restriction of the credit diminishes its effect in improving the profitability of the investment; that is as true of restrictions resting on the tax deferred character of the funds invested as of any other reduction. In the absence of any provision in the statute for such a restriction, we believe that there is *no warrant for creating one.*

We see that where Congress has intended to reduce the basis for the credit because of the source of the moneys invested, it has made express provision. An example is § 46(c)(4), added by the Senate, which provides that where property is destroyed or damaged by casualty, or stolen, and is insured, reinvestment of the insurance proceeds in replacement property is not eligible for the investment credit. The purpose was to prevent a windfall by an investment credit on insurance proceeds where the taxpayer has neither put up new funds nor expanded its business. Outside the sections dealing with the credit, nevertheless, incorporated into the investment credit provisions by § 1012 via § 46(c)(1) and regulations thereunder, § 362(c)(2) provides that if money is contributed to a corporation by a non-stockholder, any basis of property acquired within one year with such money shall be reduced by the amount of the contribution. In the absence of such expressed provision, Congress must have intended that the basis be the full amount of the moneys invested, undiminished by reason of events involved in the taxpayer's acquisition of the moneys.

We see that subsidized vessel owners are not different from other taxpayers in this respect. Although it was initially suggested that the investment tax credit not be made available to them, no such limitation was extended by Congress. On the contrary, § 48(a)(2) expressly covers "any vessel documented under the laws of the United States." The legislative history indicates that transportation industries, regulated and unregulated, were to receive the credit. This court so held in *States Steamship Co. v. United States, supra* note 3. As was there pointed out (428 F.2d at 837, 192 Ct.Cl. at 803):

> * * * it was the understanding of the conferees on the part of both the House and the Senate that the purpose of the credit was to encourage modernization and expansion of productive facilities in "both regulated and nonregulated industries." Moreover, it would be anomalous indeed to deprive a *subsidized* industry of the benefit of the credit, since that would work at cross-purposes to the subsidy, which is provided to allow the carrier to compete economically. [Emphasis in original.]

■ Defendant, in taking its position that only so much of the investment is qualified investment as did not have its source in tax deferred income on deposit in the reserve funds, relies to a great extent on Treas.Reg. § 1.48–1(b)(2) (1964), which reads as follows:

> (2) If, for the taxable year in which property is placed in service, a deduction for depreciation is allowable to the taxpayer only with respect to a part of such property, then only the proportionate part of the property with respect to which such deduction is allowable qualifies as section 38 property for the purpose of determining the amount of credit allowable under section 38. *Thus, for example, if property is used 80 percent of the time in a trade or business and is used 20 percent of the time for personal purposes, only 80 percent of the basis (or cost) of such property qualifies as section 38 property. Further, property does not qualify to the extent that a deduction for depreciation thereon is disallowed under section 274 (relating to disallowance of certain entertainment, etc., expenses).* [Emphasis supplied.]

In the text of its argument in its brief, defendant recited only the first sentence of the above-quoted subparagraph (2) and left

out entirely the portion we have emphasized. The first sentence would appear to apply to the situation at hand but we believe the portion emphasized by this court and significantly omitted by defendant places limitations on the first sentence. We do not think that the first sentence was meant to apply to the unique situation before us, particularly in light of the remainder of the regulation and for the other reasons as stated in this opinion. The emphasized portion clearly brings out the purpose of the regulation. It is a paraphrase of a statement that appears in both the House and Senate committee reports on the Revenue Act of 1962 which stipulated that investment credit should be proportionately reduced to the extent property is used for personal or entertainment purposes. If, for example, an automobile is used 80 per cent for business purposes and 20 per cent for pleasure purposes, the rule allows only the 80 per cent to qualify as section 38 property. The difficulty is that in the present case the ships purchased by plaintiff were to be and are used 100 per cent in its trade or business. The regulation has absolutely no application in a case like the present. Further, § 274, relating to disallowance of certain entertainment expenses, also has no application herein. It is significant that defendant does not point to nor can the court suppose another situation in which the first sentence could apply.

We, therefore, hold that the above-recited § 1.48–1(b)(2) has no application herein.

However, defendant argues that since the investment tax credit is computed on depreciable property, plaintiff does not get the credit based on cost basis because under the 1947 agreement a lesser basis is used to determine depreciation and it is on this cost less contributions from the reserve funds basis that the credit should be measured. This brings us to an examination of the closing agreement and the reason why the basis for determining depreciation is not cost but a lesser amount.

Defendant's primary position is that to the extent the vessels were acquired with tax-free reserve funds, they were not "section 38 property" because no depreciation was allowable thereon under the 1947 agreement. Defendant points to paragraph II of the agreement which states that money deposited in the reserve funds shall be "tax-deferred income" and to paragraph I(d) which provides that the "tax-deferred" funds are not to be recognized in the determination of cost basis. Since depreciation is allowed with respect to basis, and no depreciation may be claimed on the portion of the ships acquired with tax deferred funds, concomitantly, defendant contends that the investment credit does not extend to that portion of the vessel acquired with tax deferred funds. As a corollary, defendant argues that the term "cost basis," as used in the 1947 agreement, must have been meant to refer to "basis" as defined in § 1012.

Any consideration of the primary position presented by defendant necessarily requires this court to analyze the practical effect of the standard 1947 agreement, which other shipowners requesting subsidy entered into and which plaintiff entered into when it applied for subsidy.

It is our opinion that the fact that a portion of the cost of the ships is not depreciable because that cost has already been recovered through prior tax deferrals does not remove that portion from the investment tax credit provisions. When the parties entered the 1947 agreement, they did not anticipate the investment tax credit which came years later. They were providing a method for the recovery of a part of the cost of a vessel prior to its being purchased. In order to avoid a double deduction after the vessel had been purchased, depreciation was not allowed on that part of the cost already recovered. However, in reality, the cost to the plaintiff is what it paid for the vessels. The fact that the plaintiff was allowed to recover a portion of that cost prior to purchase by untaxed earnings and the remainder of the cost after purchase by depreciation is no different than if plaintiff were allowed accelerated depreciation in the early years of the vessel resulting in a deferral of taxes on part of

its earnings to later years when its depreciation deduction would be lesser and, consequently, its income and its tax thereon would be greater. The fact that accelerated depreciation was to be taken on a property would not affect its basis for the investment credit. We believe that plaintiff gets the equivalent of accelerated depreciation deductions in the years earnings escape taxation by being deposited in its reserve funds. The untaxed earnings are subtracted from basis; the 1947 agreement thereby adjusts basis to insure that depreciation deductions shall not be taken on elements of cost recovered through other means, *viz.*, the non-taxation of those elements when earned. Adjustments made to ensure that elements of cost are deducted only once are irrelevant to the purpose of the investment credit, *viz.*, to reduce the initial cost. We conclude that the agreement provides for an arrangement which we shall hereafter refer to as the "special depreciation arrangement." [11]

■ It is significant to this court that defendant does not in any portion of its briefs give its analysis of the special depreciation arrangement as plaintiff has done. We agree with plaintiff that since the 1947 agreement was entered into many years prior to the enactment of the investment tax credit, the parties did not anticipate the tax credit. In this respect we refer to *States Steamship Co. v. United States, supra.* In *States Steamship Co.,* this court held that Maritime could not adopt regulations reducing the benefit of the investment tax credit to subsidized operators and that the plaintiff's agreement to accept Maritime's method of computing the subsidy did not constitute a waiver of benefits conferred by the subsequent investment credit. The court said (428 F.2d at 837, 192 Ct.Cl. at 804):

> * * * It could not have been within the contemplation of either of the parties to bind themselves to any *future* changes in the tax laws, no matter how far-reaching or important. This is especially true where a whole new provision was inserted into the tax law in 1962 * * *. [Emphasis in original.]

Likewise, in the instant case plaintiff's agreement to accept the reduction in basis for depreciation, gain, and loss purposes did not constitute a waiver of benefits conferred by the subsequent investment tax credit. Plaintiff's 1947 agreement affects

11. Plaintiff well illustrates the practical effect of the 1947 agreement by referring to the special depreciation arrangement as follows:

"* * * Thus (considering the income tax [effect] first) income and gains deposited in the reserves would not 'be recognized as taxable income' when earned; later, however, as the operating-differential subsidy agreement required, the reserves would be invested in new ships, and when so invested the portion allocated to tax deferred earnings would not 'be recognized in the determination of cost basis.'

"Since basis controls the computation of depreciation, future annual deductions for depreciation expense would thus be reduced by operation of the agreement. New ships would earn a larger taxable income than in the absence of the agreement, and over the life of the ships the government would recover the taxes that had been deferred when the deposited income was earned.[26] To illustrate, $100 of earnings deposited in the reserve funds would be untaxed when earned. But when invested in a new ship costing $1000 the untaxed $100 would reduce the basis for depreciation ('cost basis') of the new ship to $900. Over the 20-year life of the new ship the annual deduction for depreciation would be $45 rather than $50, the $5 difference would be taxable income, and in 20 years the government would have recovered the deferred taxes on $100.[27]

"Similarly, as basis controls gain or loss, on any sale of the future ship the agreement would, by reducing the basis, augment the taxable gains (or reduce losses) to the extent of the tax deferred income invested in the ship. "[26] If over the 20 years the rates of taxation should rise, as in fact occurred, the government would tax the future income at higher rates, offsetting its deferral of the use of the tax money.

"[27] Accelerated depreciation produces a similar deferral of taxes. See, e. g., *Jones Bros. Bakery, Inc. v. United States,* 411 F.2d 1282, 188 Ct.Cl. 226, 246–52 (1969). Large depreciation charges reduce taxable income in the early years of an asset's useful life; in the later years accelerated depreciation accounting produces smaller depreciation charges and higher income than straight line depreciation would have produced. The additional taxable income enables the government to recover the taxes deferred in the earlier years."

the basis of its ships only for the purposes of depreciation, gain, and loss involved in the tax deferral plan. The investment credit added a new use to the uses of the concept of basis. The basis provision in the 1947 agreement could not determine the basis of the ships for the investment tax credit because the enactment of the credit modified the assumptions of the parties as to the purposes for which basis was then relevant. Such a modification brings into play the saving clause in the 1947 agreement whereby the agreement is subject to changes in the law. The "WITNESSETH" clause of plaintiff's agreement provides:

> * * * any subsequent change or modification of applicable statutory law will render this agreement ineffective to the extent that it is dependent upon such law.

For purposes of the investment tax credit enactment, therefore, the basis provisions of the 1947 agreement are inoperative and basis or qualified investment for the calculation of the credit is to be determined under the investment tax provisions without reference to those provisions of the agreement.

As defendant proposes, it is conceivable that the plaintiff could have purchased its vessels entirely with tax-free funds, in which case no portion of the cost would be recoverable through a method of depreciation. Applying defendant's premise, the plaintiff would not be entitled to the investment credit since the vessels would not be depreciable at all. This contention is tantamount to denying the investment credit to all subsidized shipowners which use only reserve funds to purchase vessels. It is unlikely that Congress intended such a result. As demonstrated hereinabove, the investment credit was a novel concept designed to stimulate the economy by reducing the cost of capital assets. Furthermore, the legislative record shows a clear and consistent Congressional intent that subsidized operators should obtain the full benefit of the investment credit. The 1947 agreement was shown to be unrelated in purpose to the investment credit. It established a special depreciation arrangement whereby deposits of taxpayer's earnings in its statutory reserve funds resulted in a change in the method by which plaintiff takes depreciation deductions on its vessels. We deem that Congress understood the effect of the investment tax credit on the 1947 agreement, that Congress foresaw the possibility that a shipowner could have purchased a vessel entirely out of its reserve funds, and that Congress intended that such a shipowner should still be entitled to the tax credit.

However, the defendant contends that there is no reference in the record to the subsidy agreement itself and, therefore, Congress had no notice of the special depreciation arrangement. It argues that these details were not shown in the record. We differ with the defendant because the 1947 agreement follows from the Maritime Act and that Act and the investment tax credit both deal with subsidized vessels. A new enactment on a subject is to be taken as intended to fit into the existing system and to be given a conforming effect unless a different purpose is plainly shown. *United States v. Arizona,* 295 U.S. 174, 191, 55 S.Ct. 666, 79 L.Ed. 1371 (1935); *United States v. Jefferson Electric Manufacturing Co.,* 291 U.S. 386, 396, 54 S.Ct. 443, 78 L.Ed. 859 (1934); *Maul v. United States,* 274 U.S. 501, 508, 47 S.Ct. 735, 71 L.Ed. 1171 (1927). Anyone dealing with the Maritime Act, which entails operating and construction subsidies, should have had some general knowledge of how the Maritime Act operates with the reserve funds requirements. Ship replacement without these reserve funds was impossible. The special depreciation arrangement which we have discussed above was a necessary portion of the entire reserve funds structure. From the legislative record we deem that when the special provision with relation to documented vessels was put in the Revenue Act of 1962, Congress knew from the very mention of the word "subsidized" that subsidized ships were involved. This necessarily meant that the investment tax credit was intended to fit into the existing system which necessarily included the special depreciation arrange-

ment. We deem it also relevant to note that when the investment tax credit was originally introduced, it did not include vessels used outside of the United States but that in the course of drafting the credit, Congress had before it, and rejected, the Treasury's view that the investment tax credit should not be made available to owners of vessels operating under an operating-differential agreement with Maritime. In fact, the decision to allow the credit on such vessels was explicitly criticized by the dissenting Congressional minority. As a result, we find that defendant's argument of no notice is unavailable.

■ Defendant alternatively contends that even if plaintiff could benefit by this court's decision that the 1947 agreement was not applicable to the investment tax credit, the plaintiff could only benefit from such a decision for 1962 and 1963. The rationale for defendant's contention is that modification of the 1947 agreement was accomplished by execution of a new agreement in 1964; and, as a result, the years beginning with 1964 would be controlled by the new agreement, which could not be construed in the same manner the 1947 agreement was construed, *viz.*, that the parties did not anticipate the investment tax credit. In answer to the defendant's argument, we deem it important again to note that the new agreement, as compared with the 1947 agreement, contained identical terms and conditions concerning the nonrecognition of tax deferred funds in the determination of cost basis, despite the fact that the new agreement was executed two years after the enactment of the investment credit provisions. The 1964 agreement did not extend the scope of the 1947 agreement. Therefore, we find that the parties themselves have evidenced an understanding that the new closing agreement was not modified by the investment credit. In other words, the concept of cost basis as defined by the 1947 agreement carried over to the 1964 agreement and was unaffected by the investment credit provisions. In support of this holding, we deem it relevant to note that the IRS had not made its present position concerning the investment credit known to the plaintiff prior to the re-execution of the 1947 agreement in 1964. The first year in which the IRS made its position openly known was 1967; its position had not been announced in 1964 when the 1947 agreement was changed in the manner hereinabove described.

The first publication of the IRS position on the point is Rev. Rul. 67–395, 1967–2 Cum. Bull. 11. In that Ruling, the IRS addressed itself to the same situation as is presented here; however, no mention is made of the existence or terms of a closing agreement.

■ We recognize that the above-cited Revenue Ruling is the IRS general position on this matter; nevertheless, this court has stated that a ruling "may be helpful in interpreting a statute, but it is not binding on the Secretary or the courts. It does not have the effect of a regulation or a Treasury Decision." *Stubbs, Overbeck § Associates, Inc. v. United States,* 445 F.2d 1142, 1147 (5th Cir. 1971); *Allstate Insurance Co. v. United States,* 530 F.2d 378, 384, 209 Ct.Cl. 1, 11 (1976). The Court stated a similar proposition in *Biddle v. Commissioner,* 302 U.S. 573, 582, 58 S.Ct. 379, 82 L.Ed. 431 (1938): " * * * departmental rulings not promulgated by the Secretary are of little aid in interpreting a tax statute, *Helvering v. New York Trust Co.,* 292 U.S. 455, 467–468, 54 S.Ct. 806, 810, 78 L.Ed. 1361, * * * ."

■ Also at issue is the effect on the investment tax credit of subsequent mortgage payments drawn from the reserve funds and allocated to tax deferred earnings. Since the tax deferred source of the funds used to originally acquire the ships here does not affect their bases for the investment credit, the identical result must follow where the funds are used to reduce the mortgages. Once the bases of the vessels are determined and the investment credit calculated, we hold that the tax deferred nature of the funds used to subsequently pay off the mortgages on the vessels is irrelevant. We recognize the IRS litigating position as stated in Rev. Rul.

68–468, 1968–2 Cum. Bull. 26; however, again we refer to *Allstate Insurance Co. v. United States, supra,* and *Biddle v. Commissioner, supra.*

One other point should be mentioned. It is not necessary to decide whether the reserve funds are tax-exempt or tax deferred since plaintiff prevails in that the closing agreement does not affect plaintiff's basis for the investment credit.

## CONCLUSION

For the reasons above, defendant's motion for summary judgment is denied, plaintiff's motion for summary judgment is granted, and the amount of recovery is to be determined pursuant to Rule 131(c).

COWEN, Chief Judge (dissenting).

The provisions of the Merchant Marine Act, 46 U.S.C. § 1101, et seq. (hereafter MMA or "The Act"), as interpreted by the Maritime Administration, required shipowners to make deposits into the reserve funds to account for depreciation, not only for ships in existence but also for the future depreciation of ships yet to be built. The result was practically unique in that (1) depreciation was permitted and earnings were exempted from tax for ships which *had not yet been purchased;* and (2) depreciation deposits generally exceeded the depreciation allowed for tax purposes. In the absence of the closing agreements, the shipowners might well have claimed additional depreciation beyond that required by the Act, by deducting depreciation on newly purchased ships bought with tax-deferred funds. In effect, this would have permitted them to depreciate the cost of the ships once before purchase and once after.

The Closing Agreements of 1947 and 1954 sought to prevent this "double dip" by excluding the tax-deferred funds from the computation of the tax basis of the ships. This was not a "special depreciation agreement" as the majority maintains. Rather, it was a broad attempt to limit excessive depreciation deductions for any tax purpose. The Closing Agreement of 1954, provided as follows:

I. *Definitions:*

\* \* \* \* \* \*

(d) "Tax-deferred" or "Tax-deferment" referring to ordinary income and capital gains deposited in Reserve Funds means that such items are not to be recognized as taxable income, except as provided in paragraph VI (c) hereof, and likewise are not to be recognized in the determination of cost basis or invested capital.

\* \* \* \* \* \*

II. *Tax treatment of deposits in reserve funds:*

All earnings including capital gains, (not tax exempt under the Internal Revenue Code), which are deposited in the taxpayer's Reserve Funds, shall be Tax-deferred income; provided, however, that the taxpayer shall not be bound by this commitment beginning with the calendar year in which a decision of any court, sustaining the contention that Section 607(h) of the Act gives a tax exemption, instead of a Tax-deferment as herein provided, shall become final.

Article V of the same Agreement, entitled "Depreciation on Subsidized Vessels," provided in part as follows:

\* \* \* Where, as the result of a portion of the price paid for vessels having been paid from funds not recognized as a part of basis for tax purposes, the amount of depreciation deposits required by the Maritime Administration exceeds the amount of depreciation so computed for tax purposes, such excess deposits shall be treated as required deposits of earnings, tax-deferred in character. \* \*

These provisions, taken together, show that the parties intended that the entire amount of tax-deferred deposits would reduce the basis of the ships for all "tax purposes." There is no attempt to limit the nature or scope of the basis reduction, or to characterize the situation in any way as a "special depreciation arrangement" for a specific purpose.

The investment tax credit, as enacted in 1962 and reenacted in 1973, allows a tax credit of 7 percent of the taxpayer's *basis* on the article purchased. Int.Rev.Code § 46(c)(1)(A). For newly acquired articles, the taxpayer's basis is *generally* the cost, as specified by Treasury Regulations § 1.46–3(c)(1). However, it is apparent that neither the Treasury Regulations nor the drafters of section 46 considered a situation by which a taxpayer's basis in property could be reduced even *before* the article was purchased, as occurred with the uniquely situated subsidized shipowners.

The reduction of the shipowners' basis before their purchase of the ships, while unusual, is nevertheless in keeping with principles evinced throughout the Internal Revenue Code. For example, section 167 requires reduction of basis to the extent of depreciation already taken, because the depreciation deduction reduces the tax cost of the article purchased.

Since the provisions of the MMA permitted the taxpayer to make deposits in a tax-deferred fund to account for future depreciation, it was reasonable that the parties would, in the Closing Agreements, agree to reduce their basis in the ships in accord with the tax deferment already received. What is not reasonable is that the majority would now restore the reduced basis of the ships to the level that existed before any depreciation had been taken. This result allows the taxpayer to compute the tax credit upon an artificially increased amount.

If it is permissible to restore a taxable basis previously reduced by agreement to the pre-existing level for purposes of computing the investment tax credit, it is logically permissible to restore that taxable basis for other purposes. For example, if the taxpayer derived capital gains from subsequent sales of its ships, it could argue that its cost basis in the ships should not be reduced by the allocable amount of reserve fund payments, but rather that the cost basis of the ships should be restored to the full amount of the cash purchase price.

The majority seeks to avoid such an untenable result by premising its holding in part upon "special reference" by Congress to subsidized industries in passing the investment tax credit. Yet the majority can find no special reference to subsidized shipowners in the legislative history and is forced to draw inferences from general statements regarding the broad objectives of the tax credit. In contrast to the majority's inferences, it is my opinion that the legislative history indicates that Congress passed the credit without considering any possible effects upon the subsidized shipping industry. Statements appearing in the Senate Finance Committee Report on the Tax Reform Act of 1976 reinforce this conclusion. I recognize the general principle that subsequent Congressional reports on what Congress intended in enacting prior legislation, are to be accorded little weight, but I feel that the remarks of the Senate Finance Committee are too pertinent to escape note here. In its Report, the Committee states that:

\* \* \* since the tax provisions relating to the capital construction fund are in the Merchant Marine Act of 1936 rather than in the Internal Revenue Code, this question [of the effect of the shipowners' reduced basis upon the investment credit] was not reviewed when the investment credit was subsequently generally restored. *S.Rep.No.* 94–938, 94th Cong., 2d Sess., 196–97 (1976).

The only reasonable conclusion to be drawn from this statement is that the framers of the tax credit were completely unaware of the situation of the subsidized shipowners when provision was made for a tax credit to be computed upon a taxpayer's basis in acquired property. It may well be that if the question now before us had been presented to and considered by Congress when the investment credit was authorized, special provision would have been made to give the subsidized shipowners the credit claimed in this action. However, I find nothing in the applicable law or its legislative history which is sufficient to warrant judicial restoration of a taxable basis in property which has been reduced in accord-

ance with the provisions of the MMA and the Closing Agreements of 1947 and 1954.

In summary, I would grant defendant's motion for partial summary judgment in so far as plaintiff's claim for investment credit includes a taxable basis which had previously been reduced by use of tax-deferred funds in purchasing the property, including both original payments and subsequent mortgage installments.

SKELTON, Judge (dissenting):

I cannot agree with the majority opinion because it allows the taxpayer a double deduction from its income tax of the money in the reserve fund used to buy the ships and to pay off mortgages on them.

The first deduction occurred when the money was deposited in the reserve fund. This was proper and in accordance with 46 U.S.C. § 1177(h) (1964) which provides that earnings deposited in the reserve funds "shall be exempt from all Federal taxes." This deduction was also in accordance with the tax closing agreements of 1947 and 1964, which provided that earnings deposited in the reserve funds would be "tax-deferred income," which was defined as meaning that such earnings were not taxed.

The second tax deduction occurred when the taxpayer included the payments from the tax exempt reserve funds in its cost basis in figuring its invested capital in the ships. This deduction was a direct and express violation and breach of the tax closing agreement of 1947 the taxpayer signed with the Internal Revenue Service. The majority holds that the Revenue Act of 1962 providing for the investment tax credit nullified the 1947 agreement. I do not agree. A new closing agreement was executed by the taxpayer and the IRS which, for all practical purposes, was the same as the 1947 agreement. These closing agreements provided that money deposited in the reserve funds "are not to be recognized in the determination of cost basis or invested capital." The taxpayer ignored this provision and included the previously deducted reserve fund money in its cost basis of the ships, thereby increasing its invested capi-

tal, resulting in an increased investment tax credit and a double tax deduction of the reserve funds.

Furthermore, the inclusion of the reserve funds in taxpayer's cost basis was in violation of Sections 38, 46 and 48 of the Internal Revenue Code of 1954 and Treasury Regulation § 1.48–1(b)(2) (1964), which allow an investment tax credit only on section 38 property, which is defined as "property with respect to which depreciation * * * is allowable." The above regulation provides that if a deduction for depreciation is allowable only on a part of taxpayer's property, then only that part qualifies as section 38 property for the purpose of determining the investment tax credit. Here, that part of the ships paid for with reserve funds (down payment and mortgage payments) is not depreciable property because the amount thereof has already been deducted from taxpayer's income tax the same as if it was the value of fully depreciated property, and it cannot qualify as section 38 property for the purpose of determining the amount of investment tax credit.

I would allow defendant's motion for summary judgment, and deny that of the plaintiff and dismiss plaintiff's petition.