## OGLEBAY NORTON COMPANY

v.

### The UNITED STATES.

#### No. 229–77.

United States Court of Claims.

Nov. 14, 1979.

William R. Stewart, Cleveland, Ohio, attorney of record, for plaintiff; Roy L. Turnell, John L. Selis, and Thompson, Hine & Flory, Cleveland, Ohio, of counsel.

Michael J. Dennis, Washington, D. C., with whom was Asst. Atty. Gen. M. Carr Ferguson, Washington, D. C., for defendant; Theodore D. Peyser, Jr., Washington, D. C., of counsel.

Before KUNZIG, BENNETT and SMITH, Judges.

ON PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DEFENDANT'S CROSS–MOTION FOR SUMMARY JUDGMENT

SMITH, Judge:

This action for refund of federal income taxes in the amount of $60,915.24, plus in-

terest thereon as provided by law, is before the court on cross-motions for summary judgment. The claims are for income taxes paid for the calendar years 1969, 1970, and 1971, and are based upon plaintiff's carry-back of an alleged excess of its investment credit for the calendar year 1972. The 1972 credit resulted from "improvements" made to three of plaintiff's bulk ore ships. These improvements were paid for entirely by qualified withdrawals in 1972 from the ordinary income account of its Interim Capital Construction Fund. Upon audit of the 1972 return, the Internal Revenue Service denied in full that portion of the investment tax credit claimed by plaintiff which was allocable to such "improvements." In essence, the disallowance was based on a determination that expenditure of amounts, upon which tax has been deferred, from a "capital reserve fund" established pursuant to the Merchant Marine Act of 1970, does not constitute a qualified investment within the meaning of section 38 of the Internal Revenue Code of 1954.[1] We conclude that the Internal Revenue Service erred and that plaintiff is entitled to recover on its claims for 1969, 1970, and 1971.

### I.

Plaintiff, Oglebay Norton Company (Oglebay Norton), is a Delaware corporation with its principal office in Cleveland, Ohio, operating a fleet of vessels in the Great Lakes trade.

On January 6, 1972, pursuant to the provisions of section 607 of the Merchant Marine Act of 1970 (46 U.S.C. § 1177) (MMA), plaintiff entered into an Interim Capital Construction Fund Agreement with the Secretary of Commerce (agreement). The agreement provided for the establishment by Oglebay Norton of an Interim Capital Construction Fund (fund), "for the purpose of providing replacement, additional or reconstructed vessels for operation in the United States foreign, Great Lakes, or non-contiguous domestic trade."[2] The agreement remained in force until superseded on November 17, 1976, by a "permanent" Capital Construction Fund Agreement between plaintiff and the Under Secretary of Commerce for Maritime Affairs. The "permanent" agreement contains direct counterparts of all of the operative provisions of the agreement, is currently in effect, and is of indefinite duration.

Under the terms of the agreement, plaintiff was required to deposit into the fund all earnings from the investment of the fund and certain proceeds from the sale or other disposition (including insurance proceeds upon total loss) of any "qualified agreement vessel."

In addition, plaintiff was permitted to deposit into the fund amounts equal to (a) up to 100 percent of its taxable income attributable to operation of "qualified agreement vessels" in the foreign or domestic commerce of the United States; (b) the annual depreciation deductions allowable on such vessels; and (c) proceeds from sale or other disposition of such vessels not required to be deposited.[3] The agreement provided that the deposits be credited to the ordinary income capital gain, and capital accounts kept on plaintiff's books in connection with the fund, and that the federal income tax consequences of such characterization shall be that required under section 607 of the MMA of 1970. Plaintiff made substantial deposits into the ordinary in-

---

**1.** This is the only issue left to be resolved. Earlier, defendant requested an order to compel and for sanctions against plaintiff for failure to produce documents. The documents were sought to determine whether plaintiff acquired the improvements for which it claims the investment tax credit after August 15, 1971. If they had been acquired on or before that date then these "improvements" would have been outside the purview of the section 50 investment tax credit. This question was resolved by the parties and taken out of the case.

**2.** This special treatment afforded to operators who take advantage of section 607 of the Merchant Marine Act of 1970 (46 U.S.C. § 1177) is limited to construction, reconstruction, or replacement, in the United States, of United States flag ships by domestic contractors.

**3.** 46 U.S.C. § 1177 (1970).

come account of the fund in every year after the fund was established.

Plaintiff was permitted to make "qualified withdrawals" from the fund for purposes specified in schedule B to the agreement, which was captioned the "General Objectives to Be Achieved by the Accumulation of Assets in the Capital Construction Fund" (general objectives schedule). Among these objectives were the conversion of the SS *Edmund Fitzgerald (Fitzgerald)*, the SS *Ashland (Ashland)*, and the SS *Frank Purnell (Purnell)*, bulk ore carriers included in plaintiff's fleet, from coal to oil burning power plants and the addition of spar deck stringer straps to the *Purnell* (all referred to hereinafter as the "improvements").

Plaintiff contracted with Fraser Shipyards, Inc., of Superior, Wisconsin, to make the improvements described in the general objectives schedule to the *Fitzgerald* and the *Ashland*, and plaintiff contracted with G & W Industries, Inc., of Cleveland, Ohio, to have it make the improvements to the *Purnell.*

Physical construction of the improvements was started after March 31, 1971.[4] The *Fitzgerald*, the *Ashland*, and the *Purnell*, each with the improvements ready for service, were delivered to plaintiff on or about May 2, 1972, July 21, 1972, and May 3, 1972, respectively. In 1972, all of the improvements were then placed in service in the Great Lakes trade by plaintiff. At that time, the improvements all had useful lives in excess of 7 years. Each of the three ships was originally documented under the laws of the United States and remained so throughout 1972.

The total cost of the improvements was $1,616,537.18, all of which was paid by plaintiff with qualified withdrawals from the ordinary income account of the capital construction fund in 1972.

Plaintiff filed a timely corporate income tax return for 1972, claiming an investment credit of $185,448.31. Of this amount,

$113,157.60 is in dispute in the instant case, being 7 percent of the $1,616,537.18 improvements paid for out of the capital construction fund. Plaintiff determined that these improvements constituted section 38 property and computed an investment credit on the purchase of these improvements.

Since the credit for these improvements, plus credit for the other investments made during 1972, exceeded the amount allowed under code section 46(a)(2) ($47,371.92), plaintiff filed a timely claim for refund for 1969, seeking to carry back $138,076.39 of unused investment credit for 1972 under the authority of section 46(b) of the code. Plaintiff further filed timely claims for refund for 1970 and 1971, seeking to carry forward that portion of the 1972 investment credit which was not consumed in the 1969 tax year.

In 1975, upon audit of plaintiff's 1972 return, the Internal Revenue Service proposed that the investment claimed for expenditures from the capital improvement fund be disallowed in full. As a result of this and other proposed adjustments, the taxpayer paid a proposed assessment totaling $39,845 for 1972. The taxpayer's claims for 1969, 1970, and 1971 were disallowed, and after the lapse of 6 months without action by the Commissioner, the taxpayer instituted this timely suit for refund for 1969, 1970, and 1971.

II.

Section 38 of the Internal Revenue Code allows a tax credit with respect to the acquisition of certain depreciable property. Section 38 was added to the 1954 Code by section 2, Revenue Act of 1962, Pub.L.No. 87–834, 76 Stat. 960, which also added sections 46, 47, and 48. In 1969, the investment credit was terminated pursuant to section 49 as added by section 703(a) of the Tax Reform Act of 1969, Pub.L.No.91–172, 83 Stat. 487, and in 1971 the credit was reinstated by section 50, as added by section

---

**4.** Construction commenced after March 31, 1971, qualified as a project entitling taxpayers to take advantage of the investment tax credit.

101(a) of the Revenue Act of 1971, Pub.L. No.92–178, 85 Stat. 497. The amount of the credit is determined pursuant to the provisions of sections 46 through 48 of the code.[5] Section 46(a)(1) provided during the years in issue that "[t]he amount of the credit allowed by section 38 for the taxable year shall be equal to 7 percent of the qualified investment (as defined in subsection (c))." The "qualified investment," as defined in section 46(c)(1)(A), is "the applicable percentage of the basis of each new section 38 property (as defined in section 48(b)) placed in service by the taxpayer during such taxable year." Section 48 of the code defines the term "section 38 property," stating that this "term includes only property with respect to which depreciation * * * is allowable and having a useful life (determined as of the time such property is placed in service) of [3] years or more."

Treasury Reg. § 1.48–1(b) (1972) provides in pertinent part that—

* * * (1) Property is not section 38 property unless a deduction for depreciation (or amortization in lieu of depreciation) with respect to such property is allowable to the taxpayer for the taxable year. A deduction for depreciation is allowable if the property is of a character subject to the allowance for depreciation under section 167 and the basis (or cost) of the property is recovered through a method of depreciation * * *. * * *

In the MMA, Congress has specifically provided for the reduction of "basis" when there are qualified withdrawals from reserve accounts. Section 607(g) (46 U.S.C. § 1177(g)), as amended by section 21(a), Merchant Marine Act of 1970, Pub.L.No.91–469, 84 Stat. 1018, is expressly entitled "Tax treatment of qualified withdrawals; basis: reduction" and paragraphs (2) and (3) state as follows: [6]

(2) If any portion of a qualified withdrawal for a vessel, barge, or container is made out of the ordinary income account, the basis of such vessel, barge, or container shall be reduced by an amount equal to such portion.

(3) If any portion of a qualified withdrawal for a vessel, barge, or container is made out of the capital gain account, the basis of such vessel, barge, or container shall be reduced by an amount equal to—

(A) Five-eighths of such portion, in the case of a corporation (other than an electing small business corporation * * *), or

(B) One-half of such portion, in the case of any other person.

### III.

The congressional purpose of the section 38 investment tax credit, contained in the legislative history, is critical to the resolution of the issue in this case. As mentioned earlier, the investment credit was initially adopted in 1962 pursuant to Pub.L.No.87–834, *supra*. Section 46 as then adopted stated that "the credit allowed by section 38 for the taxable year shall be equal to 7 percent of the qualified investment." I.R.C. § 46. The term "section 38 property," as defined in section 48(a)(1), includes tangible personal property.[7] Excluded from this broad definition was property used "outside the United States." I.R.C. § 48(a)(2)(A). This exclusion, however, was qualified in section 48(a)(2)(B)(iii) so that "any vessel documented under the laws of the United States," when eligible, could take advantage of this tax credit.[8] The eligibility of United States flag ships to this credit was consistent with the economic goals that Congress hoped to achieve by this legislation.

---

**5.** All references to the "code" or "I.R.C." are to the 1954 Internal Revenue Code, as amended in 1972.

**6.** 46 U.S.C. § 1177(g) (1970).

**7.** I.R.C. § 48; *see also* S.Rep.No.1881, 87th Cong., 2d Sess. 1, *reprinted in* [1962] U.S.Code Cong. & Admin.News, pp. 3304, 3318.

**8.** I.R.C. § 48(a)(2)(B)(iii). *See also* S.Rep.No. 1881, supra note 7, [1962] U.S.Code Cong. & Admin.News at p. 3319.

The purpose of the investment credit was clear: [9]

> The objective of the investment credit is to encourage modernization and expansion of the Nation's productive facilities and thereby improve the economic potential of the country * * * and * * [better] our competitive position in the world economy. The objective of the credit is to reduce the net cost of acquiring new equipment; this will have the effect of increasing the earnings of new facilities * * * and increasing the profitability of productive investment. * * *

It was pointed out during the Senate Finance Committee hearings that: [10]

> * * * American industry today must compete in a world of diminishing trade barriers in which the advantages of a vast market, so long enjoyed here in the United States, are now being * * * realized by many of our foreign competitors. An increase in efficiency and productivity at a rate at least equal to that of other leading industrial nations is * * necessary * * *. * * *

The intention of Congress in enacting the investment tax credit clearly was to stimulate a dragging economy.[11] It was hoped that the credit would lower the high costs of capital investment and thus allow industry to invest in new capital improvements. The merchant marine industry was just such a group that needed to be encouraged to modernize and expand its productive facilities.

In the Tax Reform Act of 1969, Congress, confronted with high inflation, repealed the investment tax credit in section 703 of that act.[12] In H.R.Rep.No.91–413, the Committee on Ways and Means stated: [13]

> * * * After careful consideration of the sources of the present inflationary pressures, your committee concluded that the stimulus to investment which is provided by the credit contributes directly to these pressures. * * *

Faced with a choice of suspending the investment credit, or repealing it, Congress chose to terminate it.[14] It was noted that suspension would constitute a positive deterrent to investment since business would be tempted to delay investment in anticipation that the suspension of the investment credit would be lifted.[15]

### IV.

In the aftermath of the termination of the investment credit, the economy once again slowed down. This slowdown affected many industries, among them the merchant marine. In 1970 Congress enacted legislation supplementing the Merchant Marine Act of 1936. This act was "to revitalize our merchant marine by providing a long-range merchant shipbuilding program of 300 ships * * *, and strengthening our bulk cargo merchant fleet in the foreign commerce of the United States." [16] The United States merchant marine, and the significance of this industry to the domestic economy, can readily be seen by the importance Congress attached to both the Merchant Marine Acts of 1936 and 1970. In fact, the explanation of section 101 of the Merchant Marine Act of 1936 was incorporated verbatim into the 1970 Senate report. The report stated: [17]

9. *Id.* at 3314.

10. *Id.* at 3313.

11. *Id.* at 3652 (additional views of Senator Eugene J. McCarthy).

12. Tax Reform Act of 1969, Pub.L.No.91–172, 83 Stat. 487.

13. H.R.Rep.No.91–413, 91st Cong., 1st Sess. 178, *reprinted in* [1969] U.S.Code Cong. & Admin.News, pp. 1645, 1832. *See also* S.Rep.No. 91–552, 91st Cong., 1st Sess. 226, *reprinted in*

[1969] U.S.Code Cong. & Admin.News, pp. 2027, 2258.

14. [1969] U.S.Code Cong. & Admin.News at pp. 1833 and 2261.

15. *Id.*

16. S.Rep.No.91–1080, 91st Cong., 2d Sess. 9, *reprinted in* [1970] U.S.Code Cong. & Admin. News, p. 4188.

17. *Id.* at p. 4189.

Sec. 101. It is necessary for the national defense and development of its foreign and domestic commerce that the United States shall have a merchant marine (a) sufficient to carry its domestic water-borne commerce and a substantial portion of the water-borne export and foreign commerce of the United States and to provide shipping service on all routes essential for maintaining the flow of such domestic and foreign water-borne commerce at all times, (b) capable of serving as a naval and military auxiliary in time of war or national emergency, (c) owned and operated under the United States flag by citizens of the United States insofar as may be practicable, and (d) composed of the best-equipped, safest, and most suitable types of vessels, constructed in the United States and manned with a trained and efficient citizen personnel. It is hereby declared to be the policy of the United States to foster the development and encourage the maintenance of such a merchant marine.

More succinctly stated: [18]

* * * The merchant marine has been appropriately termed our fourth arm of defense. To permit our security and economy to become totally dependent upon foreign vessels, operated by foreign crews, subject to the wishes of foreign governments would be to run an unacceptable risk. * * *

As a merchant marine operator, Oglebay Norton had seen the Great Lakes fleet, of which it was a part, dwindle rapidly over the period 1960–70. As of 1970, 80 percent of the Great Lakes fleet was more than 25 years old.[19] As the Senate Commerce Committee commented, "[i]n this case, the operators need the tax-deferred benefits as much to modernize and substantially reconstruct their existing vessels as to build new vessels."[20] Plaintiff, although a member of a favored industry, found many of its vessels outdated. The investment tax credit had been terminated; yet the need for investment in new or reconstructed capital equipment was essential to plaintiff's continued operation.

In 1972 plaintiff, having already entered the "agreement" with the Secretary of Commerce, undertook to take advantage of both the tax-deferred reserve funds, as set up under section 607(g) of the MMA of 1970, and the section 38 investment tax credit as restored to the code.

## V.

To qualify for the investment tax credit, Oglebay Norton must establish that the reconstructed vessels constitute section 38 property and specifically that "depreciation is allowable" on the reconstructed *Ashland, Fitzgerald*, and *Purnell*. Further, plaintiff must show that the basis for the improvements equaled $1,616,537.18 in order to entitle it to the amount of credit claimed. I.R.C. § 46(c)(1)(A).

It is the Government's position that, since taxpayer reconstructed these vessels with tax-deferred reserve funds from the ordinary income account, the improvements were not "section 38 property" because, no depreciation being allowed, by implication none therefore was "allowable," as required by the statutory definition, and, more specifically, none was "allowable to the taxpayer for the taxable year," as required by defendant's regulation.[21] Further, the Government contends in effect that even if the improvements could be considered "section 38 property" *in toto*, the "basis" required to be reduced by section 607 of the MMA becomes zero, consequently the "qualified investment" referred to in section 46 of the code also becomes zero, and that 7 percent of zero is zero.[22]

18. *Id.* at p. 4190.

19. *Id.* at p. 4216.

20. *Id.*

21. Treas.Reg. § 1.48–1(b)(1) (1972).

22. It is argued that since the "improvements" were paid for by tax-deferred funds, plaintiff here had no cost basis. In other words, the Government contends that the improvements were paid for by the Government since its tax treatment of these "funds" amounted to a sub-

Plaintiff, on the other hand, contends that these and other arguments now advanced by defendant were presented to this court for consideration in *Pacific Far East Line, Inc. (Pacific)* and rejected.[23]

In *Pacific*, a contractor under maritime operating-differential subsidy agreements sought to recover income taxes paid for tax years 1962, 1963, and 1964. The Government's denial of refund was based on a rejection of Pacific's application of the investment tax credit provisions of the code. The construction given to sections 38 and 46–48 of the code were in issue in that case, as they are here. The invested amounts in dispute in *Pacific* were payments made by taxpayer out of tax-deferred income in its reserve funds (46 U.S.C. § 1177 (1964)) for new ships it placed in service in 1962 pursuant to maritime closing agreements of 1947, 1954, and 1964.

The major issue in that case was whether that portion of taxpayer's cost for new ships, which cost was derived from tax-deferred earnings deposited in the reserve funds, should be deducted to arrive at taxpayer's qualified investment for section 38 investment tax credit purposes. The court held that Pacific's qualified investment for investment credit purposes was its cost of the ships to taxpayer, whatever the source of the money.[24] The tax-deferred income withdrawn from the reserve fund was considered as part of taxpayer's cost.

In that opinion this court stated, quoting the Supreme Court, that the legislative history of the tax credit and the legislative intent were controlling: [25]

* * * The intention of the lawmaker controls in the construction of taxing acts * * * and that intention is to be ascertained, not by taking the word or

clause in question from its setting and viewing it apart, but by considering it in connection with the context, the general purposes of the statute in which it is found, [and] the occasion and circumstances of its use * * *. * * * [*Helvering v. Stockholms Enskilda Bank*, 293 U.S. 84, 93–94, 55 S.Ct. 50, 79 L.Ed. 211 (1934).]

A few months earlier, this court stated: [26]

* * * In applying various sections of the investment credit statute, this court and other courts have noted that the [Revenue] Act should be interpreted liberally in keeping with its purposes * * *.

Other cases support this construction.[27] Taxpayer, in *Pacific*, as a merchant marine operator, was party to an operating-differential subsidy agreement. This is identical to Oglebay Norton's position except that its closing agreement was pursuant to section 607(g) of the MMA of 1970. The same reserve accounts or funds were set up for the purpose of providing "replacement vessels, additional vessels, or reconstructed vessels." As in *Pacific*, similar restrictions were placed on Oglebay Norton, to enable the money deposited in these "construction funds" to receive tax-deferred status (46 U.S.C. § 1177 (1970)).

In 1962, the first year of the investment credit, Pacific had contracted for the delivery of two new ships at a purchase price of $14 million, of which amount $1.9 million was derived from tax-deferred earnings deposited by Pacific in the appropriate accounts pursuant to its operating subsidy agreement. The agents of the Internal Revenue Service eliminated from the base used for calculation of the investment tax

---

sidy. It is undisputed that taxpayer is not entitled to any deduction for depreciation on the improvements.

23. *Pacific Far East Line, Inc. v. United States*, 544 F.2d 478, 211 Ct.Cl. 71 (1976).

24. *Id.*, 544 F.2d at 485, 211 Ct.Cl. at 84.

25. *Id.*, 544 F.2d at 484, 211 Ct.Cl. at 82.

26. *Lykes Bros. S.S. Co. v. United States*, 513 F.2d 1342, 1353, 206 Ct.Cl. 354, 375 (1975).

27. *Alabama Displays, Inc. v. United States*, 507 F.2d 844, 848, 205 Ct.Cl. 716, 724 (1974); *Minot Fed. Sav. & Loan Ass'n v. United States*, 435 F.2d 1368, 1372 (8th Cir. 1970).

credit an amount equal to those funds withdrawn from tax-deferred accounts.[28]

In *Pacific*, it was argued by the taxpayer that:[29]

> * * * [P]laintiff's investment in its ships qualifies for the investment tax credit irrespective of the source of the funds invested. Defendant responsively contends that only so much of the investment is qualified investment for the investment tax credit as did not have its source in tax deferred income on deposit in the reserve funds. * * *

The court observed that section 46(c)(1) defined investment as:[30]

> * * * "The applicable percentage of the basis of each new section 38 property * * *." Both the House Ways and Means Committee and the Senate Finance Committee reported, "The basis of 'new section 38 property' is to be determined under the general rules for determining the basis of property. Thus, the basis of property purchased or constructed would generally be its cost." * * *

Section 1012 was cited in Treas.Reg. § 1.46–3(c) (1964) which implemented the investment tax credit. In the Treasury's regulation interpreting section 1012, it was stated that "[t]he cost is the amount paid for such property in cash or other property." Treas. Reg. § 1.1012–1 (1957).

To determine Pacific's "cost" for its two new ships, the court indicated that the above approach was the correct one. The court declined to agree with the Government that this analysis in any way indicated that Pacific should subtract its "qualified investments" to reach its cost. In referring to the Government's computation of taxpayer's cost, the court stated:[31]

> * * * None of this contains the slightest indication that "qualified investment" should exclude investment funds derived from untaxed, tax-exempt, or tax deferred income. It states that the qualified investment in a "section 38 property"

is the basis of that property, that the basis is its cost, and, except for instances not here applicable, that "adjustments" to basis are to be disregarded. We believe that it is fair to say that the "general rules for determining the basis of property," referred to by the House and Senate Committees and the Treasury's regulation, have no reference to whether the funds spent as part of the "cost" of the property had their source in untaxed income. The cost of property to the taxpayer is the amount of money that he paid to acquire the property, whatever the source of the money.

As is true in this case, property is often acquired in whole or part with borrowed money; it is elementary that borrowed money is not taxed when received by the taxpayer from the lender, yet the Government could not—and does not here—contend that the taxpayer's qualified investment in the property is reduced by the amount of borrowed funds invested. The same would be true of an investment consisting in whole or in part of money received as a gift exempt from tax (§ 102), of interest earned by the taxpayer on tax-exempt municipal bonds (§ 103), of income earned abroad on which plaintiff pays no federal income tax because of the "foreign tax credit" (§ 33), or of retirement income subject to a "retirement income credit" (§ 37). Indeed, where the invested funds are derived from income on which the taxpayer's taxes have been reduced by an investment credit on other property, Congress explicitly contemplated that a further credit should be allowed on the reinvestment, for the legislative committees stated, "It is your committee's intent that the financial assistance represented by the credit should itself be used for new investment, thereby further advancing the economy." * * *

**28.** *Pacific Far East Line, Inc. v. United States, supra* note 23, 544 F.2d at 482, 211 Ct.Cl. at 79.

**29.** *Id.*, 544 F.2d at 484, 211 Ct.Cl. at 83.

**30.** *Id.*

**31.** *Id.*, 544 F.2d at 485, 211 Ct.Cl. at 84.

The Government in *Pacific*, as in the instant case, contended that since no depreciation deduction of tax-deferred funds was allowed, the property bought by these funds was not "property with respect to which depreciation * * * is allowable" and therefore could not have been section 38 property.[32] Again this argument is rejected:[33]

> * * * [T]he fact that a portion of the cost of the ships is not depreciable because that cost has already been recovered through prior tax deferrals does not remove that portion from the investment tax credit provisions. * * *

Oglebay Norton, like Pacific, could not have contemplated the implementation of the investment tax credit when it decided to go ahead with its "improvements." Even though the investment tax credit was restored in 1971 and plaintiff did not enter its capital construction agreement until January 1972, revitalization of the Great Lakes merchant marine fleet was of paramount importance. Oglebay Norton's decision to refurbish its fleet was a decision arising out of economic necessity, and not one of choice. The Government in *Pacific* tried to persuade this court that taxpayer in that case was entitled to the benefit of the tax credit only for 1962 and 1963, since the new 1964 agreement that Pacific entered into indicated Pacific's knowledge that they could not have depreciation and the credit.[34] Again this argument was rejected. The court concluded that this was not the case and in fact that when dealing with tax-deferred funds pursuant to the MMA and the investment tax credit provisions of the code, this was in effect a special depreciation arrangement.[35] It was stated then that:[36]

> * * * Plaintiff's 1947 agreement affects the basis of its ships only for the purposes of depreciation, gain, and loss involved in the tax deferral plan. The investment credit added a new use to the uses of the concept of basis. * * *

Oglebay Norton knew it had to put away money before it entered the actual construction phase of revitalizing its ships. It is happenstance, as it was with *Pacific*, that allowed Oglebay Norton to take advantage of the investment tax credit. They could not have foreseen the reenactment of the tax credit.

## VI.

The 1970 amendments to the Merchant Marine Act of 1936 did not affect the special depreciation arrangement that this court referred to in *Pacific*. The Merchant Marine Act of 1970 only consolidated the deferred fund mechanisms of the 1936 Act. By substituting the new section 607 into the 1970 MMA, the old capital reserve fund and special reserve fund were combined into one capital construction fund. In addition, the tax-deferred privilege was extended to unsubsidized American-flag operators, including those on the Great Lakes.[37] Except for minor changes, nothing indicated that new section 607(g) of the Merchant Marine Act was intended to change what had preceded it. Section 607(g) of the MMA of 1970 merely codifies the previous arrangement for closing agreements.[38] Section 607(g) is

32. *Id.*, 544 F.2d at 487, 211 Ct.Cl. at 88.

33. *Id.*

34. *Id.*, 544 F.2d at 490, 211 Ct.Cl. at 92.

35. *Id.*, 544 F.2d at 488, 211 Ct.Cl. at 89.

36. *Id.*, 544 F.2d at 489, 211 Ct.Cl. at 90. In *Pacific*, it was noted that "it is conceivable that the plaintiff could have purchased its vessels entirely with tax-free funds, in which case no portion of the cost would be recoverable through a method of depreciation. Applying defendant's premise, the plaintiff would not be entitled to the investment credit since the vessels would not be depreciable at all. This con-

tention is tantamount to denying the investment credit to all subsidized shipowners which use only reserve funds to purchase vessels. It is unlikely that Congress intended such a result. * * *." 544 F.2d at 489, 211 Ct.Cl. at 91.

37. S.Rep.No.91–1080, *supra* note 16, [1970] U.S.Code Cong. & Admin.News at p. 4216.

38. "Since under present law only 13 shipping companies use the tax deferred reserve funds, the Treasury Department was able to administer the funds through closing agreements signed with each company. This bill's expansion of the availability of the tax deferral privi-

captioned "Tax treatment of qualified withdrawals; basis: reduction." Paragraph (2) of this subsection provides that:

> * * * If any portion of a qualified withdrawal for a vessel, barge, or container is made out of the ordinary income account, the basis of such vessel, barge, or container shall be reduced by an amount equal to such portion. [46 U.S.C. § 1177(g)(2) (1970).]

In this way, the funds do not become truly tax exempt but taxpayer is required to reduce his basis by corresponding amounts so that taxpayer does not get both the use of the tax-deferred capital and depreciation on that capital.[39] In *Pacific*, this court indicated that even if the entire vessel were to be bought with tax-deferred funds, this would not disqualify taxpayer for the investment tax credit,[40] notwithstanding the fact that no depreciation deduction would be available. This is the exact situation we have before us.

### VII.

Defendant has brought forward the same arguments that it presented in *Pacific*.[41] Further, defendant contends that regulation section 1.48–(1)(b) precludes plaintiff's contention that these "improvements" are "section 38 property." Defendant asserts that plaintiff's improvements are not depreciable, because qualified withdrawals made from the ordinary income account of the reserve funds, also require that an equivalent amount of money be deducted from the basis of the ship, vessel, or the like that has been improved with the use of such funds. Since there is a one-for-one reduction here, the adjusted basis for the new improved property remains zero. All money invested

lege, however, makes it impractical for the Treasury Department to continue the practice of signing closing agreements with each company. For this reason the bill provides a more specific statutory framework for determining the tax status of deposits into and withdrawals from the fund." S.Rep.No.91–1080, *supra* note 16, [1970] U.S.Code Cong. & Admin.News at 4217.

is tax deferred and as such is not to be included in computing the readjusted basis. This argument cannot stand. This court in *Pacific* stated that in determining what it "cost" taxpayer for the new ships, the tax-deferred funds should be included in arriving at this figure. In the same sense, tax-deferred funds should not be excluded in determining the newly adjusted basis of the "improvements." The adjusted basis, however, is immediately reduced by a prescribed amount depending on which of the three accounts, set up under 46 U.S.C. § 1177 (1970), the tax-deferred funds came from. If these tax-deferred funds came from the capital gains account, then only one-half of the increase in the property's new adjusted basis will be allowed for depreciation purposes.[42] It cannot be said that the tax-deferred funds used for such improvements do not change the basis of the property. It can be said, however, that only one-half of the increase in the basis will be recognized for purposes of the depreciation deduction. This adjustment does not convert the property from "property with respect to which depreciation is allowable" to "property with respect to which depreciation is *not* allowable"; it merely affects the amount of the deduction that Congress will permit taxpayer to take for depreciation of "property with respect to which depreciation is allowable." This is also true with tax-deferred funds coming from the ordinary income account, except that when using "funds" from the ordinary income account, none of the increase in basis will be recognized for purposes of the deduction for depreciation. This was so stated in the Senate's report on the Merchant Marine Act of 1970.[43]

**39.** *Pacific Far East Line, Inc. v. United States,* *supra* note 23, 544 F.2d at 488 n.11, 211 Ct.Cl. at 89 n.11.

**40.** *Id.,* 544 F.2d at 488–89, 211 Ct.Cl. at 91.

**41.** *Id.,* 544 F.2d at 482–87, 211 Ct.Cl. at 80–87.

**42.** 46 U.S.C. § 1177 (1970).

**43.** S.Rep.No.91–1080, *supra* note 16, [1970] U.S.Code Cong. & Admin.News at p. 4215.

Further, the Senate report stated that when dealing with qualified withdrawals for vessels whose basis cannot be reduced, because there is not an adequate basis in the vessel, then the reductions are to be made in the basis of other vessels held by the person involved.[44] The clear effect of this is not an adjustment in the investment credit, but a reduction in the deduction for depreciation which would otherwise be allowable to the taxpayer. According to the Government's logic, plaintiff's improvements cannot qualify as section 38 property, because plaintiff has no basis in the property, and yet, as noted above, plaintiff could be required to reduce its basis in another vessel if it has inadequate basis for the purposes of the reduction required for the use of qualified withdrawals. Obviously, plaintiff must have a "basis" in the agreement vessels even if its basis is zero in a particular vessel. It is clear that this adjustment is required to be made in some manner in order for the withdrawals to be treated as qualified.[45]

The bases of the *Purnell, Ashland* and *Fitzgerald* were increased by the extent of approximately $1.6 million that plaintiff used to reconstruct these vessels. The adjusted basis of these vessels would have correspondingly increased had not Congress mandated that tax-deferred funds, in the case of withdrawals from the ordinary income account, would reduce the basis of section 38 investment property by a like amount. Consequently, by giving tax-deferred status to these funds, Congress has already decided that since these funds were not taxed, a further deduction for depreciation would not serve the purpose intended by the tax-deferred fund mechanism; namely, the generation of investment capital.[46] Therefore, plaintiff was prevented from taking a depreciation deduction since the funds used were treated specially.[47] If taxpayer had used solely its own money, there would be no question that it would be entitled to a depreciation deduction. Simply because a depreciation deduction was not allowable in this instance does not mean that the improvements were not depreciable property within the meaning of section 38.

In the alternative, the Government contends that even if the improvements are section 38 property, plaintiff's investment credit would still be deficient since plaintiff had no cost basis pursuant to section 607 of the MMA. This too is erroneous. It is contended by defendant that the *Coca-Cola Bottling Co.* case [48] controls. In that case taxpayer was denied an investment credit because a deduction for depreciation was not possible.[49] Taxpayer had taken the full cost of the property off its income tax in 1 year as an expense deduction.[50] Further, it was determined that the cost of breakage of returnable bottles and cases was then presently consumed and was not analogous to the gradual sale of an item over time as in the case of depreciable property.[51] Also, taxpayer in that case was reimbursed for the losses of these items by deposits of its customers.[52] That case has little to do with the situation before the court, because the election to expense the cost of the property prevented it from being property with respect to which depreciation is allowable, but

44. *Id.*, [1970] U.S.Code Cong. & Admin.News at p. 4225.

45. It is significant that at the time of the 1970 amendments to the Merchant Marine Act, there was no investment tax credit. Much like the situation in *Pacific*, references to basis here refer to depreciation only. Congress could not intend that "basis" here was supposed to have some impact on the investment tax credit, when in fact Congress the year before had terminated rather than suspended the investment tax credit.

46. S.Rep.No.1881, *supra* note 7, [1962] U.S. Code Cong. & Admin.News at p. 3314.

47. S.Rep.No.91–1080, *supra* note 16, [1970] U.S.Code Cong. & Admin.News at p. 4216.

48. *Coca-Cola Bottling Co. v. United States*, 487 F.2d 528, 203 Ct.Cl. 18 (1973).

49. *Id.*, 487 F.2d at 533, 203 Ct.Cl. at 27.

50. *Id.*, 487 F.2d at 533, 203 Ct.Cl. at 28.

51. *Id.*

52. *Id.*, 487 F.2d at 534, 203 Ct.Cl. at 29.

more importantly, the property was, in the circumstances, paid for by third parties.

Other authorities cited by defendant are equally inapposite. *Detroit Edison Co. v. Commissioner*, 319 U.S. 98, 63 S.Ct. 902, 87 L.Ed. 1286 (1943); *Denver & Rio Grande Western R. R. v. United States*, 205 Ct.Cl. 597, 505 F.2d 1266 (1974); *Millers National Insurance Co. v. Commissioner*, 54 T.C. 457 (1970); *Denver & Rio Grande Western R. R. v. Commissioner*, 32 T.C. 43 (1959), *aff'd*, 279 F.2d 368 (10th Cir. 1960); and *Denver & Salt Lake Ry. v. Commissioner*, 24 T.C. 709 (1955), all deal with situations in which the taxpayer attempts to gain section 38 tax credit or a depreciation deduction on property that was paid for by a third party. These cases have no significance here. Plaintiff did pay for its improvements. Even though the construction was paid for with tax-deferred funds, plaintiff earned this money. Even if plaintiff's money had not had tax-deferred status, over one-half of the capital invested in the "improvements" would have been plaintiff's outright.[53] The fact that plaintiff's money, and money that would have gone to the Government by means of income tax, were all a part of the same capital reserve fund, does not mean that plaintiff has no cost basis. The money in the capital reserve fund represented money that plaintiff had earned from its merchant marine business. Consequently, the taxpayer is correct in asserting that the "improvements" adjusted the basis of the vessels refurbished. It cannot be said, as the Government contends, that plaintiff had no basis in these vessels in the first place. In fact, the "im-

provements" adjusted the basis of the *Purnell, Fitzgerald,* and the *Ashland,* yet Congress mandated, since the funds were tax deferred, that the basis be reduced accordingly.

The court in *Pacific* did not overrule *Coca-Cola Bottling.* That case had no relevance to the specific facts in *Pacific.* The Government cannot contend that the 1970 amendments to the Merchant Marine Act changed the *Pacific* precedent. The decision in *Pacific* was not bottomed on the fact that there was an individual closing agreement, but rather on congressional intent.[54] Taxpayer could not take a deduction for depreciation on the property in *Pacific* as a matter of law.[55] "The investment tax credit reflects the legislature's decision to use the taxing system for economic ends."[56]

Congress fully intended that merchant marine operators be treated as a special industry. As a special industry, Congress intended subgroups within the merchant marine to be treated uniformly.[57] Congress expanded the benefit of the operating subsidy agreements to both subsidized and unsubsidized merchant marine, thus both groups should be treated equally. Provisions of the MMA of 1970 allowed merchant marine operators to retain their old closing agreements or transfer the amounts held in the old fund into a new capital construction fund.[58] Therefore, it would seem that since taxpayers had this option, differences, if any, between the two systems would have to have been slight, otherwise there would be no uniformity of treatment between subsidized and unsubsidized merchant marine operators and this would run counter to the

---

**53.** At the maximum income tax rate, plaintiff would have still retained a little more than one-half of the money not deposited in the tax-deferred funds.

**54.** *Pacific Far East Line, Inc. v. United States, supra* note 23, 544 F.2d at 489, 211 Ct.Cl. at 91.

**55.** *Id.*

**56.** *Id.*, 544 F.2d at 483, 211 Ct.Cl. at 81. As noted in hearings on H.R.15424, H.R.15425, and H.R.15640 before the Subcommittee on Merchant Marine, regulations prescribed under the authority of section 607(h) would follow the form of the present closing agreements and

"thereby provide a uniform basis for determining the tax liability of operators that enjoy the benefits extended by section 607 as it would be amended." *Hearings on H.R.15424, H.R.15425, and H.R.15640 Before the Subcomm. on Merchant Marine of the House Comm. on Merchant Marine and Fisheries,* 91st Cong., 2d Sess. 151 (1970).

**57.** S.Rep.No.91–1080, *supra* note 16, [1970] U.S.Code Cong. & Admin.News at p. 4214.

**58.** *Id.* at p. 4213.

stated legislative intent.[59] The extension of the Merchant Marine Act of 1936, as amended, to unsubsidized merchant marine operators was not intended to extend only part of the benefits that the subsidized merchant marine already enjoyed. The adoption of this position would help defeat the congressional goal of building 300 ships in the ensuing decade.[60] To hold for defendant would negate the clearly established congressional intent.[61]

## VIII.

Before the 1962 enactment of the investment tax credit, both the House and Senate referred to the need to reduce the cost of acquiring new equipment in industry so as to stimulate the economy.[62] It was stated before the Senate Finance Committee that:[63]

Realistic depreciation *alone*, however, is not enough to provide the essential economic growth. *In addition*, a specific incentive must be provided if a higher rate of growth is to be achieved. The investment credit will stimulate investment, first by reducing the net cost of acquiring depreciable assets, which in turn increases the rate of return after taxes arising from their acquisition. * * * [Emphasis supplied.]

In fact, the investment tax credit of 1962 was criticized by some members of Congress for being allowed on vessels such as those in *Pacific*.[64] The termination of the credit in 1969 and its restoration in 1971 did not involve any significant changes in the operation of the credit or its purposes. The reasons used in the 1971 restoration of the credit were the same as those used when the investment tax credit was first enacted.[65]

* * * [I]t is unthinkable that the amount of the conceptually simple investment credit was intended—without a word of textual support—to be affected by the extent of taxation or the deferral of taxation on income that had produced funds used to make the investment that creates the credit. * * * [66]

In *Greer v. Commissioner*, the fifth circuit stated:[67]

* * * We think that the tax statutes and regulations must be applied as written and without any equitable consideration of the desirability of offsetting prior tax benefits. [Footnote omitted.]

As we stated in *Pacific*:[68]

* * * [W]here Congress has intended to reduce the basis for the credit because of the source of the moneys invested, it has made express provision. * *

Plaintiff's motion for summary judgment is granted; defendant's cross-motion for summary judgment is denied; and the case is remanded to the trial division for compu-

---

59. *Id.*

60. *Id.* at p. 4188.

61. If section 607(g) of the Merchant Marine Act did not bestow the same advantages to unsubsidized operators that subsidized operators enjoyed, there would be inconsistent treatment between these two groups which would seem *contra* to the legislative intent. See H.R.15424, H.R.15425, and H.R.15640, 91st Cong., 2d Sess. 151, 238 (1970).

62. S.Rep.No.1881, *supra* note 7, [1962] U.S. Code Cong. & Admin.News at p. 3314.

63. *Id.*

64. *Pacific Far East Line, Inc. v. United States, supra* note 23, 544 F.2d at 490, 211 Ct.Cl. at 92.

65. H.R.Rep.No.92–533, 92d Cong., 1st Sess. 1, *reprinted in* [1971] U.S.Code Cong. & Admin. News, pp. 1825, 1833.

66. *Pacific Far East Line, Inc. v. United States, supra* note 23, 544 F.2d at 485, 211 Ct.Cl. at 84–85.

67. *Greer v. Commissioner*, 230 F.2d 490, 493–94 (5th Cir. 1956).

68. *Pacific Far East Line, Inc. v. United States, supra* note 23, 544 F.2d at 486, 211 Ct.Cl. at 85. Defendant's reliance on Rev.Rul. 67–395, 1967–2 C.B. 11, and Rev.Rul. 68–468, 1968–2 C.B. 26, is misplaced. These revenue rulings were squarely faced and disposed of in *Pacific*.

tation of the recovery pursuant to Rule 131(c).[69]

**69.** Since defendant has conceded the section 50 issue and withdrawn its motion requesting order to compel and for sanctions, plaintiff's mo-tion for order directing defendant to respond to request for admissions, being moot, is denied.